859 P.2d 948

**Melinda E. OSTERAAS, n/k/a Melinda E. Havner, Plaintiff–Respondent,**

v.

**Edwin L. OSTERAAS, Defendant–Appellant.**

**No. 19615.**

Supreme Court of Idaho, Eastern Idaho, September 1992 Term.

Sept. 1, 1993.

Dunn & Clark, P.A., Rigby, for appellant, Robin D. Dunn, argued.

Swafford Law Office, Chtd., Idaho Falls, for respondent, Ronald L. Swafford, argued.

BISTLINE, Justice.

This case requires us to examine to what extent religion may be taken into account as a factor in determining child custody disputes. Because the trial court improperly considered religion as a factor in modifying custody, we remand the cause to the trial court for reconsideration.

## BACKGROUND

In October 1986, plaintiff-respondent Melinda Havner (formerly Osteraas) and defendant-appellant Edwin Osteraas were divorced. The dissolution decree granted joint legal custody with physical custody of their twin sons, Justin and Austin, to Melinda, their mother, who had been their primary caretaker since birth.

On March 2, 1990, Edwin, the father, moved for a change of physical custody, apparently in response to the mother's assertion that she intended to marry Jerry "Tex" Havner and move to Bremerton, Washington. On July 20, 1990, the magistrate court (trial court) modified the custody order, granting physical custody of the children to the father for nine months of the year, with the mother receiving physical custody for the three summer months. The trial court arrived at this disposition by concluding that the mother's move constituted a substantial change in circumstances and that, although the parents were equal in almost all respects, the father would provide more stability and superior moral training.[1] The trial court arrived at the latter conclusion by examining what it called "the religion factor."

The mother appealed the ruling to the district court, which reversed the trial court by order dated October 15, 1991; the district court found that substantial and material changes of circumstance did not exist and ruled that the trial court had improperly considered religion in determining custody. The district court granted the father's motion to stay the transfer of custody to the mother until May 28, 1992, the

day the children completed second grade.[2] The father then appealed to this Court from the district court's order reversing the trial court's decision, raising the following issues:

I. Whether the father made a sufficient showing of substantial change of circumstances justifying a modification of custody of the children; and

II. Whether the trial court properly considered religion in granting a change of custody.

## STANDARD OF REVIEW

█ In reviewing a trial court's opinion, we give due consideration to the district court but directly review the trial court's opinion independently of the district court's decision. *Robinson v. Joint School Dist. No. 331*, 105 Idaho 487, 490, 670 P.2d 894, 897 (1983); *Milliron v. Milliron*, 116 Idaho 253, 255, 775 P.2d 145, 147 (Ct.App.1989).

█ The determination of the custody of minor children is commended to the sound discretion of the trial court; unless such discretion is abused, the court's judgment as to custody will not be upset on appeal. *Levin v. Levin*, 122 Idaho 583, 586, 836 P.2d 529, 532 (1992). The standard being that of one of judicial discretion not abused, we review a custody decision by asking whether the trial court: 1) correctly perceived the issue as one of discretion; 2) acted within the outer boundaries of its discretion and consistently with the legal standards applicable to the specific choices available to it; and 3) reached its decision by an exercise of reason. *See Sun Valley Shopping Ctr., Inc. v. Idaho Power Co.*, 119 Idaho 87, 94, 803 P.2d 993, 1000 (1991).

### I.

The first issue is whether the trial court's finding of a substantial change of circumstances was supported by substan-

---

**1.** The trial court found that the mother was a better housekeeper and was more closely bonded emotionally with the twins.

**2.** It would thus appear that the children have been residing with Melinda and her new husband since that date.

tial, competent evidence. We hold that it was.

■ Once a custody order is entered, the party seeking to modify it must first demonstrate that a material, substantial change of circumstances has occurred since the original custody order. *See, e.g., Levin v. Levin*, 122 Idaho at 586, 836 P.2d at 532. After answering this threshold question in the affirmative, the paramount concern is the best interest of the child, as determined pursuant to I.C. § 32–717. *Id.*

■ We disagree with the district court's conclusion that the father failed to make a sufficient showing of a substantial change of circumstances. The mother, the primary physical custodian of the children, intended to move to the state of Washington and to take the children with her. Such a move would obviously render it impossible for the father to continue seeing the children two weekends a month and every Wednesday night, per his decreed visitation rights, thus requiring the court to modify the divorce decree appropriately.

■ We thus hold that a geographical relocation of minor children, such that the custody decree cannot be followed as previously entered, constitutes a substantial change of circumstances sufficient for the party seeking modification to be granted a hearing. We do not hold that such move *necessitates* that physical custody be transferred, only that such a move illustrates the likelihood that there is a need for considering some sort of modification which reflects the new circumstances. The party moving for modification still bears the burden of demonstrating that the best interests of the child or children will be served by modification.

## II.

Next, we inquire whether the trial court's utilization of the "religion factor" was inconsistent with the legal standards applicable to the available specific choices, thereby amounting to an abuse of discretion.

The trial court examined the relevant factors as set forth by I.C. § 32–717, including the mental and physical health and integrity of all individuals involved. *See* I.C. § 32–717(5). The court included in that grouping what it styled "the religion factor." Because the content of the trial court's conclusions as to this factor are of paramount concern in reaching a just and proper resolution, it is appropriate to display the entirety of his discourse on that subject:

The court received evidence regarding the religious preferences and activity, or lack thereof, of the parties. As a preamble to this portion of the decision, the court notes that it is aware of the case of *Compton v. Gilmore*, 98 Idaho 190, 560 P.2d 861 (1977). The *Compton* case provides the rule that courts generally should maintain an attitude of strict impartiality between religions and should not disqualify any applicant for child custody or visitation rights from taking children to a particular church, except where there is a clear and affirmative showing that the conflicting religious beliefs affect the general welfare of the children. However, the court feels the *Compton* case is inapplicable for the following reasons:

(1) In this case there is no dispute between the religious preferences of the plaintiff and defendant because *the plaintiff [mother] is currently completely inactive in any religion. Furthermore, the plaintiff has been religiously inactive for a very protracted time period extending backwards in time past the time of her marriage to the defendant.*

(2) The court utilizes the evidence regarding religion only as a factor relevant to weighing and balancing the options available for the custody of the twins and determining what is in the best interest of the said children.

As stated above, *the plaintiff currently is and has been inactive in any religion for a significant time period. Although her religious affiliation is Catholic, she testified that she plans on acti-*

*vating in Tex's religion, which is the Church of Christ. However the plaintiff testified that she would not do this until they moved to Bremerton. Ironically, Tex has not been active in his religion since he moved to Idaho in approximately July of 1989. Thusly, the court specifically rejects the plaintiff's proposition that she will reactivate in any religion in the near future.*

*Not surprisingly, the plaintiff testified that she has not and does not provide the twins with any type of religious training or opportunities, either by activities or learning in her home or by taking them to a religious institution.*

Tangentially related to the religious training of the twins is the learning that they receive in their home from their parent(s), by precept of example, regarding other important principles of life that prepare them to be normal, productive and successful adult members of our society. The court is referring to such principles as responsibility, courtesy, selflessness, honesty, punctuality, industry, dependability, morality, self-reliance and independence, patience, etc. Although the plaintiff testified that she takes time with the boys to teach them good character traits, the court is persuaded that her sincerity, desire, ability and effort in this area are only a small fraction of that exercised by the defendant. Considering the totality of the evidence regarding both parties, the court specifically finds that although the boys *may* learn these traits from the plaintiff, the said children *will* learn them from the defendant. Additionally, the court finds that the quality and quantity of such training will be much greater in the defendant's home than the plaintiff's home, and that through living with the defendant the boys will eventually be much better citizens and more normal, productive and successful adults.

Corrected Order in Re: Contempt [and] Modification of Decree, Clerk Tr. 136–138 (emphasis in original and added).

We cannot agree with the trial court's view that *Compton v. Gilmore*, 98 Idaho 190, 560 P.2d 861 (1977), does not apply in the instant case. The trial court's attempt to distinguish *Compton* on the basis that the court was not comparing different religions but merely degree of religiousness is wholly unpersuasive. The guiding spirit of *Compton v. Gilmore* is that not only must courts avoid comparing one religion to another, but that in custody disputes courts refrain from entering the tangled web of religion altogether. *Compton*, 98 Idaho at 192, 560 P.2d at 863 (quoting *Munoz v. Munoz*, 79 Wash.2d 810, 489 P.2d 1133, 1135 (1971): "[W]here the trial court does not follow the generally established rule of noninterference in religious matters in child custody cases without an affirmative showing of compelling reasons for such action, we are of the opinion that this is tantamount to a manifest abuse of discretion."); *cf. Meredith v. Meredith*, 91 Idaho 898, 434 P.2d 116 (1967).

■ If *Compton* is thought to be insufficient authority, we need only turn to the Idaho and United States constitutions. Breaching the rule of religious noninterference as to custody proceedings implicates both the free exercise and anti-establishment clauses. U.S. CONST. Amend. I. When the state, speaking through its courts, intimates that parents who choose not to observe a certain (or indeed, any) religious faith are subject to having their custodial rights jeopardized because of that choice, the import will be to force upon each of those parents a painful and unconscionable decision to either hold to their own beliefs or maintain custody of their children. Such a decision would thus impinge upon their right to choose and adhere to their own respective beliefs, thereby violating the free exercise clause. *Cf. Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (State could not require Sabbatarian to choose between her religion, which prohibited working on Saturdays, and unemployment compensation by requiring that a benefits recipient be willing to accept jobs on Saturdays).

The other effect of utilizing the religion factor in deciding custody disputes is that the courts will be seen as appearing to favor one religion over another, or favor religion in general as against no declared religion,[3] thus using this factor would serve to establish such religion in contravention of the First Amendment establishment clause because it would have the primary effect of advancing religion, thus violating the second prong of the *Lemon* test. *See Lee v. Weisman,* —— U.S. ——, ——, 112 S.Ct. 2649, 2655, 120 L.Ed.2d 467 (1992); *reaffirming Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).[4] It is thus clear that the trial court's distinction between religion and lack thereof cannot prevail against provisions stated in the United States Constitution.[5]

Even were the failure to maintain neutrality as to the religion factor in child custody litigation not contrary to the federal constitution, art. 1, § 4 of the Idaho Constitution is an even greater guardian of religious liberty. It provides, in relevant part, "Guaranty of religious liberty.—The exercise and enjoyment of religious faith and worship shall forever be guaranteed; and no person shall be denied any civil or political right, privilege, or capacity on account of his[/her] religious opinions." "Religious opinion" is a broad term that would seem to include not only traditional religious beliefs but also one's opinions as to religion in general. Thus, denying a parent custody because of certain entertained religious beliefs, or lack thereof, clearly would be denying that parent a civil right because of such religious opinions or beliefs.

We thus reject the contention that, in the absence of a compelling reason, the favoring of religiousness over nonreligiousness in custody proceedings is permissible. Here, on the record which we review, the father has failed to demonstrate an interest sufficiently compelling to justify the trial court's taking religion into account.

A trial court may, in its discretion, undertake an examination of the ethical [6] traits parents will teach to the children—for instance, as the trial court noted, responsibility, courtesy, honesty, punctuality, industry, dependability, self-reliance and in-

3. Contrary to the trial court's belief, the State may not prefer religion over no religion. As the United States Supreme Court long ago held, "The establishment of religion clause of the First Amendment means at least this: Neither a state nor the federal government is empowered to establish a church. Neither may pass laws which aid one religion, *aid all religions,* or prefer one religion over another." *Everson v. Board of Educ.,* 330 U.S. 1, 15, 67 S.Ct. 504, 511, 91 L.Ed. 711 (1947) ("Consequently, [the state] cannot exclude individual Catholics, Lutherans, Mohammedans, Baptists, Jews, Methodists, non-believers, or the members of any other faith, *because of their faith, or lack of it,* from receiving the benefits of public welfare legislation" (emphasis in original)).

4. The United States Supreme Court's recent decision, *Zobrest v. Catalina Foothills School Dist.,* —— U.S. ——, 113 S.Ct. 2462, 125 L.Ed.2d 1, although it did not specifically apply the *Lemon* test to *Zobrest* facts, did not overturn *Lemon.*

5. The importance of the religion clauses cannot be overstated. For an excellent discourse on the history of religious favoritism and persecution which led to the adoption of the clauses, *see Everson,* 330 U.S. at 8–15, 67 S.Ct. at 508–11.

The religion clauses are central both to the framers' and to our current day conception of freedom. As the United States Supreme Court has recently reminded us, "The First Amendment's Religion Clauses mean that religious beliefs and religious expression are too precious to be either proscribed or prescribed by the State. The design of the Constitution is that preservation and transmission of religious beliefs and worship is a responsibility and a choice committed to the private sphere, which itself is promised freedom to pursue that mission. It must not be forgotten then, that while concern must be given to define the protection granted to an objector or a dissenting non-believer, these same Clauses exist to protect religion from government interference." *Lee v. Weisman,* —— U.S. ——, —— – ——, 112 S.Ct. 2649, 2656–57, 120 L.Ed.2d 467 (1992).

6. In this particular context, we use the term "ethical" to refer to those traits necessary to be a productive member of secular society, as opposed to "moral," which we use here to have religious connotations. Using any traits beyond those which secular society agrees upon tends to implicate weighing and judging of religions rather than determining the neutral characteristics we have set forth.

dependence—all being factors that could be used in determining the best interests of the child. However, such an examination must be undertaken with due regard for parents' constitutional rights pertaining to religion and freedom of speech. We presume that Idaho courts are well aware that such an examination not serve as pretext, inadvertent or otherwise, for delving into an inquisition of either parent's religion or degree of devotion.

Although the trial court did purport to take into account teaching of ethical traits in its decision to modify custody, its method of determining the ethics taught by each parent belies the actual process utilized, i.e., a comparison of religious devoutness. Moreover, we note that the trial court dwelled on the history and future of the mother's religious involvement and failed to mention other testimony, such as that presented by the kindergarten teacher as to the twins' behavior traits of cooperation and courtesy, which acknowledged traits suggest that the trial judge erred in his assessment.

██ In light of the above, we find and conclude that the trial court abused its discretion in removing primary physical custody from the mother based in part on that court's perception of her lack of religiousness. In *Meredith v. Meredith,* 91 Idaho 898, 434 P.2d 116 (1967), this Court held that where there was other evidence sufficient to support the trial court's findings and conclusions in a custody case, the trial court's error in admitting evidence concerning defendant's religion in determining fitness for custody of children was not reversible, in other words, we applied a harmless error test. 91 Idaho at 902–03, 434 P.2d at 120–21. In *Meredith,* the other evidence consisted of, inter alia, testimony that the husband was guilty of incestuous conduct with an older daughter from a prior marriage. In the instant case, whether other evidence was sufficient to support the trial court's findings and conclusions apart from the trial court's reliance on the impermissible factor of religion is far from clear.[7] In fact, the trial court remarked several times that both parents were fit, loving, and substantially equally qualified to parent. Because of the difficulty in determining whether the trial court's error was harmless, we remand the cause to the trial court for further proceedings not inconsistent with the views expressed herein.[8]

### CONCLUSION

We vacate the decision of the district court reversing the trial court's decision and remand the cause to the trial court with directions to enter an order directing mediation between the mother and father. *See* I.R.C.P. 16(j)(5); *see also Stockwell v. Stockwell,* 116 Idaho 297, 301, 775 P.2d 611, 615 (1989). If mediation is unsuccessful, the trial court shall reconsider the father's motion for modification in a manner consistent with the above opinion.

Because of the above disposition, no costs are awarded.

McDEVITT, C.J., and JOHNSON and TROUT, JJ., concur.

7. The only other factor upon which the magistrate seemed to rely was the statutory factor of continuity and stability. The magistrate found that Havner's new husband might have to relocate due to his job in the Navy. Oddly enough, although the magistrate found in connection with the presumption of joint physical custody that "[s]ince [Havner] has been the primary custodial parent the boys are, naturally, more emotionally bonded to her than [Osteraas]," in his discussion of the continuity and stability factor he discussed neither this finding nor the fact that the children had not been separated from Havner for more than a few days since their birth.

8. We also caution the trial court on remand to refrain from inappropriate references to the mother's: 1) marital status and age at the time of the children's step-brother's birth fourteen years prior to trial; and 2) her relationships prior to her recent marriage. *See Roeh v. Roeh,* 113 Idaho 557, 558, 746 P.2d 1016, 1017 (Ct.App. 1987) (I.C. § 32–717 bestows broad discretion upon a judge regarding custody decisions; however, the court must avoid considering irrelevant factors). Not only are these facts irrelevant, but the trial court's references color the proceedings with a troubling appearance of partiality.

BAKES, Justice Pro Tem., dissenting.

While I agree with much of what the majority says about the necessity for the courts to "maintain neutrality as to the religion factor in child custody litigation," I believe that the trial court in this case did not base its decision upon the so-called "religion factor," but upon its finding that the defendant was best able to provide the children with the training and character traits necessary for them to become well adjusted adults.

As the majority notes, the trial judge acknowledged that the law required the judge to "maintain an attitude of strict impartiality between religions." While the trial court did discuss at length the various religious beliefs and activities of the parties, the trial court nevertheless based its decision upon the "important principles of life that prepare them [the children] to be normal, productive and successful adult members of our society." The trial court stated those principles to be "responsibility, courtesy, selflessness, honesty, punctuality, industry, dependability, morality, self-reliance and independence, patience, etc." The trial court found, after weighing the totality of the evidence, that the defendant would provide a greater quantity and quality of such training, and then concluded that the boys, by living with the defendant, "will eventually be much better citizens and more normal, productive and successful adults."

The majority acknowledges that there is evidence in the record to sustain those findings, and that those reasons are adequate to sustain the trial court's decision. The majority nevertheless reverses the trial court and remands for further consideration because the trial court's opinion spent too much time discussing the religious beliefs and activities of the parties. It is unfortunate and detrimental to the children to reverse the trial court's judgment, which is adequately supported by the record, merely because he was too descriptive of the religious activities and interests of the two parents.

I would affirm the magistrate court's decision, based upon its finding that the defendant is best able to teach the children "responsibility, courtesy, honesty, punctuality, industry, dependability, self-reliance and independence," and that the "boys will eventually be much better citizens and more normal, productive and successful adults" if the primary custody is with the defendant. Those findings are adequately supported by evidence in the record.