902 P.2d 477

### In the Matter of BABY BOY DOE, A Minor Child.

**Joe and Jane DOE, Petitioners–Respondents–Respondents on Appeal,**

v.

**John ROE and Mary Roe, Respondents–Respondents–Respondents on Appeal,**

and

**Indian Tribe, Intervenor–Appellant–Appellant on Appeal.**

No. 21723.

Supreme Court of Idaho, Boise, March 1995 Term.

Aug. 25, 1995.

Idaho Legal Aid Services, Inc., Lewiston, Robert J. McCarthy; Idaho Legal Aid Services, Inc., Boise, Howard A. Belodoff, for appellant Tribe.

Underwood & Steele, Carolyn S. Steele, Boise, for respondents Joe and Jane Doe.

Ronald J. Wilper, Caldwell, for Baby Boy Doe.

Van G. Bishop, Nampa, for respondent John Roe.

Richard L. Harris, Caldwell, for respondent Mary Roe.

SILAK, Justice.

This case concerns the application of the child custody proceedings of the federal Indian Child Welfare Act ("ICWA"), 25 U.S.C. §§ 1901–1923 (1988), to the termination of the parental rights of an Indian father and the adoption of his child by a non-Indian couple.

## I.

### BACKGROUND AND PRIOR PROCEEDINGS

The child in this case was born in 1989. The mother is a non-Indian and never married the child's father. Shortly after birth, the mother placed the child with the adoptive parents, and he has remained with them to the present. After placing the child, the mother signed consents to the termination of her parental rights and to adoption by the adoptive parents. When the adoptive parents initiated proceedings to terminate the father's parental rights, the father's Indian tribe intervened. The tribe sought application of ICWA. The magistrate judge (trial court) held that the ICWA did not apply, and terminated the Indian father's parental rights. The tribe appealed to the district court which affirmed. The tribe then appealed to this Court.

In *In the Matter of Baby Boy Doe*, 123 Idaho 464, 849 P.2d 925 (1993) (*Doe I*), we held that ICWA applied, and vacated the trial court's order which terminated the parental rights of the Indian father. In *Doe I*, this Court did not decide the issues of the termination of the father's parental rights and the placement of the child, remanding those questions to the trial court for further proceedings. *See generally, Doe I.*

On remand, the mother retained counsel and filed an appearance in the case, followed by a petition to rescind termination of her parental rights. She had not previously participated in the case. The tribe objected to the mother's appearance, but the trial court took that issue under advisement and allowed the mother to participate. The trial court held six days of hearings in October and December 1993. In May 1994, the trial court issued a memorandum decision and order. Therein, the trial court (i) held that the mother's consents to terminate her parental rights and the consents to adoption were invalid, and that she was a proper party to the proceedings, (ii) terminated the father's parental rights under ICWA, (iii) found good cause to deviate from ICWA's placement preferences, and (iv) ruled that the mother may proceed to place the child for adoption with the adoptive parents. The tribe appealed to the district court, and this Court granted the district court's petition to assume jurisdiction of the appeal. The father did not file an appeal, and did not participate in the proceedings on remand.

## II.

### ISSUES

1. Were the mother's consents to termination of parental rights valid, and was she a proper party below?

2. Were active efforts made to prevent breakup of the Indian family, as required under 25 U.S.C. § 1912(d)?

3. Is the trial court's finding of likely serious emotional harm to the child supported by evidence from testimony of qualified expert witnesses, as required under 25 U.S.C. § 1912(f)?

4. Is the trial court's finding of likely serious emotional harm to the child supported by evidence beyond a reasonable doubt, as required under 25 U.S.C. § 1912(f)?

5. Does good cause exist to deviate from the placement preferences of the ICWA?

## III.

### STANDARD OF REVIEW

■■■ This Court will uphold the trial court's findings of fact if supported by substantial competent evidence. *Ireland v. Ireland,* 123 Idaho 955, 957–58, 855 P.2d 40, 42–43 (1993). On issues of law, we exercise free review. *Ausman v. State,* 124 Idaho 839, 841, 864 P.2d 1126, 1128 (1993). Whether the trial court correctly applied ICWA to the facts of this case is a question of law and is subject to free review by this Court. *In the Matter of Baby Boy Doe,* 123 Idaho 464, 469, 849 P.2d 925, 930 (1993).

## IV.

### MOTHER'S REVOCATION OF CONSENTS AND PARTICIPATION AS A PARTY

■ The tribe opposed the mother's appearance in the case, arguing her legal rights were terminated by an order of June 1990 after she voluntarily consented to termination of her parental rights. The trial court analyzed four separate consents (two consents to terminate parental rights, and two consents to adoption), and concluded the consents to termination and to adoption were invalid. Alternatively, the trial court held that if valid, the mother had the right to withdraw or rescind her consents, and therefore, was a proper party to the proceedings.

We need not address the parties' contentions respecting each consent to resolve whether the mother had standing to participate below. We hold that none of the consents to terminate parental rights complied with ICWA's statutory formalities, and that the order of June 1990 terminating the mother's parental rights is invalid. Because the mother's parental rights were not terminated, we conclude she had standing to participate in these proceedings.

Both Idaho law and ICWA contain statutes stating the formalities required for a voluntary termination of parental rights. *See* I.C. § 16–2005; 25 U.S.C. § 1913(a). In such situations, ICWA requires a court to apply the state or federal law provision which provides "a higher standard of protection" to a parent's rights. 25 U.S.C. § 1921; *see Matter of Appeal in Pima County Juvenile Action No. S–903,* 130 Ariz. 202, 635 P.2d 187 (App.1981). We hold that 25 U.S.C. § 1913(a) applies here, because it offers greater protection to parents of Indian children. Unlike the state law counterpart, the federal statute requires judicial certification that the terms and consequences of the consent were fully explained:

> Where any parent or Indian custodian voluntarily consents ... to termination of parental rights, *such consent shall not be valid unless* executed in writing and recorded before a judge of a court of competent jurisdiction and *accompanied by the presiding judge's certificate that the terms and consequences of the consent were fully explained in detail and were fully understood by the parent* or Indian custodian. ...

25 U.S.C. § 1913(a) (emphasis added). None of the mother's consents to termination of parental rights contain the required judicial certification. Even the June 14, 1990 consent to termination, which the trial court stated adhered to statutory formalities (under *state* law), was invalid under 25 U.S.C. § 1913(a) for lack of the judge's certificate that the terms and consequences of the consent to terminate were fully explained.

■ The trial court also ruled that the termination order of June 18, 1990 was invalid because it was conditional and did not divest the mother of all legal rights. We agree. Under I.C. § 16–2011, an "order ter-

minating the parent and child relationship shall divest the parent and the child of all legal rights, privileges, duties, and obligations, including rights of inheritance, with respect to each other." The June 1990 termination order was conditional; it terminated the mother's parental rights only in favor of the adoptive parents.

■ Because the mother's parental rights were never terminated, it follows that she was a proper party to the proceedings below. Accordingly, we need not further analyze whether the consents to adoption were valid. The trial court held alternatively that if the consents to adoption were valid, the mother could revoke them under 25 U.S.C. § 1916(a). Having concluded that the mother had standing irrespective of the consents to adoption, we need not reach the revocation issue.

## V.

## EFFORTS TO PREVENT BREAKUP OF INDIAN FAMILY

The trial court's memorandum decision terminating the father's parental rights focused on the requirements of 25 U.S.C. §§ 1912(d) and 1912(f). Section 1912(d) provides in pertinent part:

> Any party seeking to effect a ... termination of parental rights to[ ] an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

25 U.S.C. § 1912(d). The trial court concluded that active efforts were made to prevent the breakup of the Indian family. Two subsidiary issues exist here: (i) what is the burden of proof, and (ii) were adequate remedial services provided?

## A. BURDEN OF PROOF

■ The tribe argues it must be shown "beyond a reasonable doubt" that rehabilitative efforts were offered and were futile, citing *In the Matter of the Welfare of M.S.S.,* 465 N.W.2d 412 (Minn.Ct.App.1991). However, 25 U.S.C. § 1912(d) does not expressly

establish the "beyond a reasonable doubt" standard, but rather appears to provide a lesser standard: "shall *satisfy* the court that active efforts...." (emphasis added).

Our review of the statute's language and the legislative history has convinced us that Congress never intended a "beyond a reasonable doubt" standard to apply in 25 U.S.C. § 1912(d). Starting first with the language of subsection (d) itself, we note that the word "satisfy," as used, has a distinct meaning. The definition which seems most consistent with this context is "to persuade by argument or evidence." *Webster's Third New International Dictionary* 2017 (1971). Unless a contrary purpose is clearly indicated, ordinary words are given their ordinary meaning when construing a statute. *E.g., Ada County v. Roman Catholic Diocese,* 123 Idaho 425, 428, 849 P.2d 98, 101 (1993). We cannot say that the ordinary meaning of the word satisfy is to convince "beyond a reasonable doubt." The beyond a reasonable doubt standard connotes a higher evidentiary burden than the ordinary meaning of "satisfy."

Furthermore, the legislative history reveals that Congress meant in subsection (d) to impose a Federal requirement similar to those in state laws, which require agencies involved in child placements to resort to remedial measures before initiating termination proceedings:

> Subsection (d) provides that a party seeking foster care placement or termination of parental rights involving an Indian child must *satisfy the court* that active efforts have been made to provide assistance designed to prevent the breakup of Indian families. *The committee is advised that most State laws require public or private agencies involved in child placements to resort to remedial measures prior to initiating placement or termination proceedings, but that these services are rarely provided. This subsection imposes a Federal requirement in that regard with respect to Indian children and families.*

H.R.Rep. No. 1386, 95th Cong.2nd Sess. 22 (1978), *reprinted in* 1978 U.S.C.C.A.N. 7530, 7545 (emphasis added). Idaho's statutes require judicial findings that "reasonable ef-

forts to prevent the placement of the child in [foster or shelter] care ... were provided but were not successful...." *See* I.C. § 16–1610(b)(2), I.C. § 16–1614. However, those statutes do not require proof "beyond a reasonable doubt." We doubt Congress meant to establish a more stringent evidentiary standard in subsection (d) than found in state laws after which it was patterned.

Moreover, Congress knew how to place a more stringent evidentiary standard in subsection (d) if it wished. In reviewing other sections of the statute, it is apparent Congress established stricter evidentiary standards in 25 U.S.C. § 1912 subsections (e), "clear and convincing," and in (f), "beyond a reasonable doubt." The legislative history of subsections (e) and (f) shows that Congress knew when it was inserting evidentiary standards, and was sensitive to the burdens imposed by different standards:

> Subsections (e) and (f) *establish evidentiary standards* for foster care placement or termination of parental rights. As introduced, H.R. 12533 required a "beyond a reasonable doubt" standard for both actions. While the committee feels that the removal of a child from the parents is a penalty as great, if not greater, than a criminal penalty, *it amended the bill to reduce the standard to "clear and convincing"* in the case of foster care where parental rights are not terminated.

H.R.Rep. No. 1386, 95th Cong.2nd Sess. 22 (1978), *reprinted in* 1978 U.S.C.C.A.N. 7530, 7545 (emphasis added). By amending subsection (e) to *reduce* the standard from "beyond a reasonable doubt" to "clear and convincing," Congress displayed considered precision in articulating the evidentiary burdens it was imposing.

In summary, the "shall satisfy" language itself, the legislative history of subsection (d), and a comparison of the "shall satisfy" terminology with the stricter "clear and convincing" and "beyond a reasonable doubt" standards of subsections (e) and (f), convince us that the "beyond a reasonable doubt" standard is not properly applied in subsection (d), but that a lesser standard is appropriate. *Compare People in Interest of S.R.*, 323 N.W.2d 885, 887 (S.D.1982) (applying "be-yond a reasonable doubt" standard under subsection (d)); *see also In the Matter of the Welfare of M.S.S.*, 465 N.W.2d 412 (Minn.Ct. App.1991); *In re L.N.W.*, 457 N.W.2d 17, 19 (Iowa Ct.App.1990); *Matter of Morgan*, 140 Mich.App. 594, 364 N.W.2d 754, 758 (1985).

## B. ACTIVE REMEDIAL EFFORTS

■ Although the beyond a reasonable doubt standard does not apply to subsection (d), the trial court's finding of adequate remedial efforts must be supported by substantial and competent evidence to endure on appeal. The trial court concluded that active efforts were made to prevent the breakup of the Indian family, but had been unavailing.

■ The trial court listed four ways active services were given. First, the adoptive parents' attorneys gave the father notice under I.C. § 16–1513 regarding his right to file a paternity claim for the child and an opportunity to indicate willingness to support the child. The tribe filed a paternity claim on the father's behalf, but the father has never taken any action to support or initiate contact with the child. Second, the mother asked the father to attend counselling with a church social worker before the child's birth, but the father refused. Third, the state of Utah attempted to encourage the father to support his children by initiating a wage withholding for child support, and the father has continued to refuse to pay support. And fourth, an attorney was appointed to represent the father, but over the past four years he has failed to cooperate in any way with his attorney or participate in these proceedings. The trial court then found that:

> [u]nder the circumstances, those efforts were all that were reasonably available. [The father] consistently and persistently refused and failed to cooperate in any manner with any attempts by any person to provide him with remedial or rehabilitative services and that [sic] any other attempts would have been futile. All remedial and rehabilitative efforts have been totally unsuccessful.

This Court must uphold the above finding if supported by substantial competent evidence. We believe it is. Perhaps most tell-

ing is the trial court's observation that the father has "failed over the past four years to cooperate in any way with his attorney or to participate in these proceedings." We believe that the types of remedial and rehabilitative services to be required under subsection (d) depend on the facts of each case. If the services necessary under the circumstances of this case should be those aimed at preventing dissolution of the legal parent-child relationship, it seems there could be no better services than appointment of an attorney at public expense, and the many hours of attorney time spent by representing the tribe in defending the father's interest. Yet, the father has consistently exhibited indifference. We hold that under the circumstances of this case, the trial court's finding of adequate remedial services is supported by substantial competent evidence.

## VI.

## QUALIFIED EXPERT WITNESSES

 As required under 25 U.S.C. § 1912(f), the trial court considered whether continued custody of the child by the father is likely to result in serious emotional or physical damage to the child. The trial court concluded the evidence does not establish beyond a reasonable doubt that the father's continued custody is likely to result in serious *physical* damage to the child, but that the evidence does establish the father's continued custody of the child is likely to result in serious *emotional* damage to the child. The trial court recognized that this finding must be supported by "evidence including testimony of qualified expert witnesses." 25 U.S.C. § 1912(f).

On appeal, the tribe contends the adoptive parents failed to meet their burden of proof with testimony of qualified expert witnesses. This argument lacks merit. Neither the language nor purpose of ICWA require the testimony of more than one qualified expert witness. *See, e.g., D.A.W. v. Alaska*, 699 P.2d 340, 342 (Alaska 1985). *D.A.W.* is persuasive. In support of its holding, it quotes the Federal Rules of Construction Act, 1 U.S.C. § 1 (1947):

In determining the meaning of any Act of Congress, unless the context indicates otherwise ... words importing the plural include the singular....

*Id.* at 342. *D.A.W.* also quotes, as did the trial court, 44 Fed.Reg. 67593 D(a), which states that removal:

of an Indian child ... must be based on competent testimony *from one or more experts* qualified to speak specifically to the issue of whether continued custody ... is likely to result in serious physical or emotional damage to the child.

(emphasis added). Accordingly, if at least one expert witness competently testified as to the emotional damage issue, the standard has been satisfied.

 The tribe has tacitly admitted that Mr. Floyd Wyasket, a Ute Indian and expert called by the adoptive parents, was a qualified expert witness under ICWA. Our review of Wyasket's trial testimony leads us to conclude that the trial court did not err in determining that Wyasket was a qualified expert witness. Among other things, Wyasket has an MSW degree from Utah State University, and was pursuing his PhD degree at Utah State. At the time of trial he was the Chief Appellate Judge for the Ute Indian Tribe; has been personally involved in several ICWA appeals; has worked as a counselor in foster and adoption cases on his reservation; he has placed Indian children outside their homes where the respective children were abused, neglected, and abandoned; he actually lived on Baby Boy Doe's father's reservation for a time; and he interviewed the child in this case and observed the bonding with the adoptive parents. Wyasket concluded in his professional opinion that permanent removal of the child from the adoptive home would likely result in serious emotional harm. Mr. Wyasket alone seems to satisfy the expert witness criterion under ICWA.

Other witnesses called by attorneys for the adoptive parents and the child were qualified experts because of expertise in their specialties. The trial court found in particular that a Dr. John McGaha was a qualified expert witness. Dr. McGaha has a PhD degree in criminal justice and is on the faculty of

Southeast Missouri State. He is a published author in his field, specializing in family dysfunction and its relationship to the juvenile justice system. He also continues to work in the juvenile justice field as a caseworker.

■ The child's court appointed attorney called Dr. Cynthia Brownsmith as an expert witness. She is a licensed psychologist in the state of Idaho, and has a PhD in special education. She works exclusively with children, particularly emotionally disturbed children and their educational needs. Both Dr. McGaha and Dr. Brownsmith also concluded that the father's continued custody is likely to result in serious emotional damage to the child. "Special knowledge of Indian life is not necessary where a professional person has substantial education and experience and testifies on matters not implicating cultural bias." *In the Matter of N.L.*, 754 P.2d 863, 867 (Okla.1988); *In re Krystle D.*, 30 Cal. App.4th 1778, 37 Cal.Rptr.2d 132, 145 (6 Dist. 1994); *State ex rel. Juvenile Dept. v. Charles*, 70 Or.App. 10, 688 P.2d 1354 (1984). We recognize that the tribe also called expert witnesses who would be qualified under ICWA, but the weight to be given to expert testimony is for the trier of fact. *E.g., State v. Blair*, 91 Idaho 137, 138, 417 P.2d 217, 218 (1966). We hold that the trial court's finding of likely serious emotional harm was supported by qualified expert witness testimony.

## VII.

## SERIOUS EMOTIONAL HARM TO THE CHILD

■ ´ The provision of ICWA applicable to the consideration of whether termination of an Indian's parental rights is warranted because of the danger of serious emotional or physical harm to a child is found at 25 U.S.C. § 1912(f) which states:

> No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

The record shows that the magistrate applied this standard, for he found:

> "The Court finds and concludes that the determination that [the father's] continued custody of [the child] is likely to result in serious emotional damage to the child is supported by evidence beyond a reasonable doubt."

(R. at 372).

Where the burden of proof at trial was beyond a reasonable doubt, we will uphold such a finding on appeal if there was substantial evidence from which a rational trier of fact could have reached its conclusion beyond a reasonable doubt. *State v. Filson*, 101 Idaho 381, 386, 613 P.2d 938, 943 (1980).

In addition to the expert witness testimony discussed above in section VI, the trial court made factual findings which support its conclusion of likely emotional damage. The trial court found that the mother informed the father of her pregnancy shortly after she learned of her condition, but the father neither offered nor assisted the mother with either the pregnancy or with the medical costs associated with the pregnancy and birth. The trial court found that through conclusion of the trial proceedings the father had never provided any support for the child nor offered to do so.

The trial court found that the father is the father of at least six children by four women. All four, including the mother of Baby Boy Doe, two of the father's former wives, and his current wife, testified at trial. The former wives testified as to the father's failure to maintain any regular contact with their children, including his failure to send gifts or post cards. One of the former wives testified that she was the victim of acts of domestic violence by the father in the presence of their children. The testimony provided examples of the father's lack of honesty and integrity, such as borrowing money without returning it, and engaging in affairs during the former marriages. The former wives also testified regarding the effect of the father's actions on their children. One child is afraid of the father. At the time of trial, two sons were in counseling, and one of them was

being treated for a serious sexual identity problem.

In summary, the trial court found that the father has never provided any financial support for the child nor offered to do so; the father has abandoned and failed to support his other children; the father has made no effort to establish a relationship with the child; the father committed acts of domestic violence against the mother of three of his other children in the children's presence; the father is not honest in his personal affairs and lacks integrity; the father's conduct has confused, hurt, and angered his other children. These subsidiary findings seem amply supported by the evidence.[1]

On the record before us, we conclude that the trial court could rationally have found beyond a reasonable doubt that continued custody by the father is likely to cause serious emotional damage to the child.

## VIII.

## GOOD CAUSE TO AVOID ICWA PLACEMENT PREFERENCES

■ Once the trial court terminated the father's parental rights, the court considered the appropriate placement for the child under ICWA:

In any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families.

25 U.S.C. § 1915(a). The trial court recognized that the adoptive parents do not fall within any category given preference under ICWA, but found that "good cause" existed to deviate from the preferences.

■ Regarding our standard of review, we first note that the House Report in the

legislative history states the following regarding 25 U.S.C. § 1915(a):

Subsection (a) provides that, in the absence of good cause to the contrary, a preference shall be given to adoptive placement of an Indian child with the extended family; a member of the child's tribe; or another Indian family. This subsection and subsection (b) establish a Federal policy that, where possible, an Indian child should remain in the Indian community, *but is not to be read as precluding the placement of an Indian child with a non-Indian family.*

H.R.Rep. No. 1386, 95th Cong. 2nd Sess. 22 (1978), *reprinted in* 1978 U.S.C.C.A.N. 7530, 7546 (emphasis added). The introductory language to the BIA guidelines regarding ICWA state that "use of the term 'good cause' was designed to provide state courts with flexibility in determining the disposition of a placement proceeding...." 44 Fed. Reg. 67584 (1979), *citing* S.Rep. No. 597, 95th Cong., 1st Sess. 17 (1977). In view of the trial court's superior position to ascertain the facts, and the flexibility Congress intended trial courts to have regarding the "good cause" determination, we believe this determination should be commended to the sound discretion of the trial court, and will not be upset on appeal absent an abuse of discretion. *Osteraas v. Osteraas,* 124 Idaho 350, 352, 859 P.2d 948, 950 (1993) (determination of custody of minor children is commended to the sound discretion of the trial court); *see, e.g., Matter of Adoption of F.H.,* 851 P.2d 1361 (Alaska 1993) (good cause determination under 25 U.S.C. § 1915(a) is within superior court's discretion). Accordingly, we consider "whether the trial court (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion and consistently with the legal standards applicable to the available choices; and (3) reached its decision by an exercise of

---

1. In addition to the above factual findings, the trial court stated other more general findings or conclusions. For instance, the trial court found that the father exhibited "a long term, chronic pattern of instability in his personal life, employment history, his residences, the pursuit of his education, his finances, and virtually every other aspect of his life." We express no opinion regarding whether the trial court's general conclusions are each supported by the record, because the more specific factual findings are supported by the record and along with the expert witness testimony constitute an adequate basis for the finding of likely serious emotional damage to the child.

reason." *Osteraas,* 124 Idaho at 352, 859 P.2d at 950. We find no abuse of discretion here.

The trial court relied on the BIA guidelines for guidance regarding the "good cause" inquiry:

> For purposes of ... adoptive placement, a determination of good cause not to follow the order of preference set out above shall be based on one or more of the following considerations:
>
> (i) The request of the biological parents or the child when the child is of sufficient age.
>
> (ii) The extraordinary physical or emotional needs of the child as established by testimony of a qualified expert witness.
>
> (iii) The unavailability of suitable families for placement after a diligent search has been completed for families meeting the preference criteria.

44 Fed.Reg. 67594 F.3.(a) (1979).

In determining whether "good cause" existed, the trial court rejected the arguments by the adoptive parents' counsel that the child is old enough to request a preference; the child has extraordinary physical needs mitigating against the preferences; and that the proposed Indian placement (with the maternal aunt and uncle) is unsuitable. The trial court demonstrated knowledge of applicable legal standards in rejecting the adoptive parents' argument that negative social and economic conditions on the reservation constitute good cause. The trial court correctly held that ICWA requires the court to apply the prevailing social and cultural standards of the Indian community. 25 U.S.C. § 1915(d).

However, the trial court held that the following considerations "individually and in totality" did constitute "good cause" to deviate from the ICWA placement preferences: (1) the mother's request to place the child with the adoptive parents; (2) the certainty of psychological and emotional trauma if the child is removed from the adoptive parents; (3) likelihood of emotional damage to the child if the child has contact with the father while living with the extended family on the reservation; and (4) the need for permanen-cy that placement with the adoptive parents would satisfy. Unless this Court can conclude as a matter of law that none of the asserted grounds individually or in totality constitute "good cause," the trial court's conclusion should be confirmed.

The trial court did not err as a matter of law by giving weight to the mother's preference to place the child with the adoptive parents. ICWA expressly provides that where appropriate, the preference of a parent shall be considered. 25 U.S.C. § 1915(c); 44 Fed.Reg. 67594 F.3.(a)(i) (1979). *See, e.g., In the Adoption of F.H.,* 851 P.2d 1361 (Alaska 1993) (mother's preference for placement with adoptive parents was appropriate factor in finding good cause).

Likewise, we cannot say the trial court erred in considering the certainty of psychological and emotional trauma if the child is removed from the adoptive parents. The trial court stated there was little disagreement among the expert witnesses that a change in custody would have adverse consequences on the child's psychological and emotional well being. Rather, the conflict among the experts involved the degree of harm and the outlook for mitigating the trauma through planning, cooperation and counseling. Nevertheless, there was substantial agreement among the experts that emotional trauma would result from a change of custody. We recognize that the law cannot be applied to automatically reward those who maintain custody during protracted litigation. *See, e.g., Mississippi Band of Choctaw Indians v. Holyfield,* 490 U.S. 30, 54, 109 S.Ct. 1597, 1611, 104 L.Ed.2d 29 (1989) (*citing In re Adoption of Halloway,* 732 P.2d 962, 972 (Utah 1986)). But the certainty of emotional damage need not be ignored by the trial court in the balancing of interests. It "is not ours to say whether the trauma that might result from removing these children from their adoptive family should outweigh the interest of the Tribe—and perhaps the children themselves—in having them raised as part of the [Indian] community." *Mississippi Band of Choctaw Indians,* 490 U.S. at 54, 109 S.Ct. at 1611 (deferring to tribal courts to fashion appropriate remedy). We find no error by the trial court in considering the

certainty of psychological and emotional trauma if the child is removed from the adoptive parents.

The next factor the trial court relied upon was the likelihood of emotional damage if the child has contact with the father while living with the extended family on the reservation. As stated earlier, the trial court found beyond a reasonable doubt that custody by the father is likely to cause serious emotional damage to the child. The trial court relied on this finding as a consideration in its "good cause" analysis. The evidence at trial indicated the father would have contact with the child if placed with the proposed Indian family (the child's paternal aunt and uncle), and that the father would play a role in instructing or teaching the child. The trial court held that "the likelihood of serious emotional damage to the child if [the father] has continuing involvement in the child's life constitutes a factor creating an extraordinary emotional need with respect to the child and is, in and of itself, a sufficient consideration to constitute 'good cause' to deviate." We find no error in the trial court's analysis. If the child is placed on the reservation, the likely contact with the father, and likely emotional damage therefrom, is a valid consideration.

As a fourth justification, the trial court found that the child's paternal aunt, with whom the tribe sought to place the child, was equivocal as to her intent to adopt the child or just provide a foster placement, while the adoptive parents unequivocally desired to adopt the child and provide a permanent home. The trial court held that the child's need for permanency created an extraordinary emotional need sufficient to constitute good cause. The trial court seemed to presume the child's need for permanence could be met only through adoption.

At least one other court has held such an assumption improper. *See Matter of Custody of S.E.G., A.L.W. and V.M.G.*, 521 N.W.2d 357 (Minn.1994). In *S.E.G.*, non-Indian foster parents sought to adopt three Indian children for whom they had previously provided foster care. The children were currently in an Indian foster placement. The trial court found that the children had extraordinary emotional needs which were be-

ing met in the current Indian foster placement, except for the need for permanence. *Id.* at 364. In finding good cause to deviate from ICWA's placement preferences, the trial court in *S.E.G.* implicitly assumed that only adoption could meet the children's need for permanence.

On appeal, the Minnesota Supreme Court found nothing in ICWA, its legislative history, or the BIA guidelines and their commentary, which precludes consideration of the need for permanence or stability in determining whether good cause exists. *Id.* at 363. However, the court concluded that other permanent placement options besides adoption, such as permanent foster care, may satisfy the need for permanence. In *S.E.G.*, there was testimony that the children's need for permanence could be met through attachment to the tribe as an ongoing part of life, and the court relied on legislative findings that "[a]n Indian child may have scores of, perhaps more than a hundred relatives who are counted as close, responsible members of the family." *Id.*, (*quoting* H.R.Rep. No. 1386, 95th Cong.2d Sess. (1978), *reprinted in* 1978 U.S.C.C.A.N. 7530, 7532). The court held that good cause may include a child's need for stability, but that this is not equivalent to a need to be adopted, and accordingly reversed the trial court's finding of good cause. *Matter of Custody of S.E.G.*, 521 N.W.2d at 358, 364.

We find the reasoning of *S.E.G.* persuasive. However, even if the trial court erred as to its finding relating to permanency, that error is not dispositive here, because of additional considerations, not present in *S.E.G.*, which were relied upon by the trial court below. We hold that the trial court committed no abuse of discretion by considering (1) the mother's request to place the child with the adoptive parents; (2) the certainty of psychological and emotional trauma if the child is removed from the adoptive parents; and (3) the likelihood of emotional damage if the child has contact with the father while living with the extended family on the reservation. Taking these considerations together, the trial court could reasonably conclude good cause existed to deviate from ICWA's placement preferences. We find the trial

464

court's conclusion was reached by an exercise of reason, is within the outer boundaries of its discretion, and is consistent with the applicable legal standards.

■ The tribe raised a final argument on an evidentiary issue. The trial court excluded from evidence a photocopy of a letter offered by the tribe, part of which had been lost or destroyed. We have considered the tribe's arguments on this issue, and are not persuaded. Assuming *arguendo* that the trial court erred in excluding the exhibit, such an error would not change the result, and would be considered harmless error by this Court.

## IX.

## CONCLUSION

The trial court's memorandum decision and order of May 1994 is affirmed. Specifically, we hold that the mother's consents to termination of her parental rights were invalid, as was the June 18, 1990 order terminating her parental rights. Accordingly, the mother was a proper party to the proceedings below.

We uphold the trial court's ruling that active efforts have been made to provide remedial services and rehabilitative programs to the father under 25 U.S.C. § 1912(d). We reject the tribe's contention that the burden of proof under subsection (d) is "beyond a reasonable doubt." The trial court's finding of active remedial efforts is supported by substantial, competent evidence.

We hold that the trial court's finding under 25 U.S.C. § 1912(f) that continued custody of the child by the father is likely to result in serious emotional damage to the child is supported by qualified expert witness testimony, and that there is substantial evidence from which the trial court could rationally have reached its conclusion of likely emotional damage beyond a reasonable doubt. Accordingly, we affirm the trial court's termination of the father's parental rights toward Baby Boy Doe.

We hold that the trial court did not abuse its discretion in determining that good cause existed to deviate from ICWA's placement preferences under 25 U.S.C. § 1915(a). The trial court considered appropriate factors in its "good cause" analysis, such as the mother's preference to place the child with the adoptive parents, the certainty of psychological and emotional trauma if the child is removed from the adoptive parents, and the likelihood of emotional damage if the child has contact with the father while living with the father's extended family on the reservation.

Finally, we hold that the trial court's exclusion from evidence of a partial photocopy of a letter was harmless error, if error at all.

This case is remanded to the trial court for further proceedings consistent with this opinion. No attorneys fees on appeal. Costs to Baby Boy Doe and Joe and Jane Doe.

McDEVITT, C.J., JOHNSON, TROUT and SCHROEDER, JJ., concur.