CYNTHIA M. BROWN, NOW KNOWN AS CYNTHIA M. MORALES, APPELLANT, V. DWIGHT E. BROWN, JR., APPELLEE.
621 N.W.2d 70

Filed December 22, 2000.   No. S-99-1444.

James M. Kelley, of Berry, Kelley, Hansen & Reiman, for appellant.

Terrance A. Poppe and Joseph E. Dalton, of Morrow, Poppe, Otte, Watermeier & Phillips, P.C., for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

GERRARD, J.

## I. NATURE OF CASE

Cynthia M. Brown, now known as Cynthia M. Morales, appeals the district court's denial of her request to be granted sole custody of her minor children and for leave of the court to relocate with the children from Lincoln, Nebraska, to Suffolk County, New York. The primary question presented in this appeal is whether the procedures and criteria articulated by this court in *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999), apply to a situation in which the parties share joint legal and physical custody of the children.

## II. PROCEDURAL BACKGROUND

Two children were born of the marriage of Cynthia and her former husband, Dwight E. Brown, Jr. (Dwight): Dwight III, born May 27, 1993, and Jasmine, born February 3, 1995. The parties were divorced in 1997, and the divorce decree entered by the district court on February 19, 1997, provided that the parties would share joint legal and physical custody of the children. The decree required Dwight to pay child support in the amount of $120 per month.

On September 14, 1998, Dwight filed a petition to modify the decree, seeking a reduction of his child support obligation. On October 6, Cynthia filed a cross-petition to modify the decree. Cynthia alleged that a material change in circumstances had occurred in the following particular respects: (1) Cynthia had graduated from nursing school, (2) Cynthia had secured employment in New York, (3) Dwight had remarried, and (4) Cynthia's income would increase when she began her employment at her new job in New York. Cynthia sought to have sole legal and physical custody of the children placed with her and

asked the district court to grant leave for her to relocate with the children to New York.

Dwight filed an amended petition to modify the decree on November 4, 1998. In addition to seeking a reduction of his child support obligation, Dwight alleged that Cynthia's lifestyle and living arrangements were inappropriate for the children and that Cynthia did not provide for the daily needs of the children. Dwight alleged that it would not be in the best interests of the children to be separated from Dwight. Dwight prayed that custody of the children be granted to him and that the district court order child support to be paid by Cynthia.

Trial was had on September 7, 1999, and on November 22, the district court entered an order modifying the decree such that Cynthia would be required to pay child support in the amount of $155 per month and Dwight's obligation to pay child support would be terminated. Neither party has appealed the child support modification. The district court determined that it was not in the best interests of the children to set aside the arrangement of joint custody. The district court found that Dwight was the physical custodian of the children no less than 50 percent of the time and that in some areas, such as health care and school, Dwight had been the primary custodian. The district court found that under the standards set forth in *Farnsworth v. Farnsworth, supra*, the quality of life would not be improved for the children in New York and that the best interests of the children did not favor such a move. The district court dismissed Cynthia's cross-petition to modify and dismissed Dwight's request to modify custody. Cynthia timely appeals. Dwight has not cross-appealed.

## III. FACTUAL BACKGROUND

Cynthia testified at the hearing in the district court that she had graduated from nursing school in May 1998 and had been working since graduation as a registered nurse. She testified that she was earning $17 per hour and working approximately 72 hours during each 2-week pay period at Madonna Rehabilitation Hospital in Lincoln.

Cynthia testified that at the time of hearing, she had been offered employment at the New York University Medical Center (NYU) in New York City. She would be working full time as a

registered nurse on the evening shift, from 3 to 11 p.m., and would earn a base salary of $25 to $30 per hour, plus approximately $7,000 annually in shift and experience differentials. Cynthia further testified that her pay would increase with advanced experience and education. Cynthia stated that the NYU job would be a professional advancement because NYU is a teaching hospital.

Cynthia testified that the NYU job would also include other benefits, such as insurance for herself and the children. Cynthia stated that NYU would pay for her to complete her master's degree and that the children would be able to obtain a free college education at NYU. Cynthia admitted that the children would be able to receive the free education at NYU regardless of whether or not the children lived in New York. Cynthia testified that she would not be able to take this particular job with NYU if she did not report for work on September 21, 1999, but that she would be able to take another available position with NYU after that date. Cynthia stated that she would not move to New York if she was not allowed to take the children with her.

Cynthia testified that she had arranged for temporary housing with her cousin in Suffolk County, on Long Island. Cynthia stated that she had located affordable housing for herself and the children in Suffolk County and that the schools in Suffolk County would be adequate for the children. Cynthia admitted that housing in Suffolk County would be more expensive than comparable housing in Lincoln. Cynthia stated that her cousin would be able to care for the children while Cynthia was at work.

Cynthia also testified that her extended family, including her parents, lived on the east coast and that Dwight's extended family also lived on the east coast. Dwight testified that some of his extended family, including his mother and some of his siblings, lived on the east coast, but that Dwight's remaining extended family, including his father and other siblings, lived in Nebraska.

Both parties testified that Cynthia and Dwight had divided their time with the children on a 50-50 basis. Dwight testified that the usual division of time was such that Dwight picked up the children from Cynthia at 3:30 p.m. every Sunday, and kept them until 3:30 p.m. on Wednesday or Thursday of alternate

weeks, such that each party would have the children 4 days one week and then 3 days during the next week. Cynthia testified that if granted full custody and leave to relocate, she was willing to give Dwight visitation during summers, holidays, and spring breaks, and would be willing to pay for air travel so that Dwight could have visitation. Dwight testified that it would be financially difficult for him to travel to New York for visitation.

Cynthia testified that the New York area had many family activities that the children would enjoy, "from baseball games to art museums to beaches." Cynthia testified that both children were bright and adaptable. Cynthia admitted that she had not taken the children to museums or art galleries available in Lincoln. Dwight testified that he was aware of cultural opportunities in New York and in Lincoln, but that "[a]ny time you spend with a child is beneficial, it doesn't matter where you take them." Dwight testified that he had taken the children to the "Elephant Hall" museum, and Dwight's wife, Shelley Brown, testified that they participated in many family activities, including visiting the zoo and parks, going for ice cream, visiting Elephant Hall and the children's museum, and going to children's movies.

Cynthia also testified regarding her belief that the children, as members of a racial minority, would be better off in New York because the area is more racially diverse. Cynthia stated that her children had not been taunted or discriminated against in Lincoln, but did mention that they were "stared at" on the street. Dwight testified that Dwight III's school in Lincoln was racially diverse.

Dwight testified that he had remarried, that he and Shelley had one additional child, and that Shelley was pregnant at the time of the hearing. Dwight testified that he was working 15 to 20 hours a week at the Lighthouse's youth recreation center and part time as a licensed minister. Dwight testified regarding his plans to attend seminary and become an ordained minister. Dwight also testified that he had recently accepted a promotion that would result in his working more hours. Dwight testified that he had opportunities to move from Lincoln but that he had decided to stay because he believed Lincoln was the best environment for the children.

Dwight testified that Cynthia's proposed move to New York was the "driving force" behind his request for a change in custody. Dwight stated that he believed that the joint custody arrangement was best for the children but that he believed that it would be best for the children to remain with him if Cynthia moved to New York. Dwight stated that he always put his children first but that Cynthia often put herself first, ahead of the children. Dwight testified that he had concerns that Cynthia did not feed the children properly. Dwight admitted that he had a child support arrearage of $1,577.

Dwight III's kindergarten teacher testified that she saw Dwight at school frequently; Dwight was a volunteer crossing guard and often had lunch at school with Dwight III and his classmates. The kindergarten teacher stated that Dwight was an active and attentive parent to both children. The teacher testified that Cynthia also frequently came to the school for lunch and to help in class. Dwight III's teacher testified that he had progressed well in school and was a very well-adjusted child. Dwight testified that he was planning to enroll Jasmine in preschool. Dwight testified that Cynthia had taken the children to the doctor once, but that he was primarily responsible for their medical and dental care.

Cynthia admitted that Dwight is a good father and stated that she had no concerns about Shelley's also caring for the children. Cynthia stated that Dwight had a positive relationship with the children and that she had no concerns about Dwight adequately providing for the needs of the children. Shelley testified that Dwight had a very close relationship with his children. The executive director of the Lincoln Council on Alcoholism and Drugs, a friend and former coworker of Dwight, testified that Dwight was a model father and that she had asked Dwight to mentor her stepson, who is a single parent. The executive director of the Lighthouse also testified that Dwight was a model parent.

## IV. STANDARD OF REVIEW

Child custody determinations, and visitation determinations, are matters initially entrusted to the discretion of the trial judge, and although reviewed de novo on the record, the trial judge's determination will normally be affirmed absent an abuse

of discretion. *Jack v. Clinton*, 259 Neb. 198, 609 N.W.2d 328 (2000); *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999). A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrain from acting, but the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system. *Weinand v. Weinand, ante* p. 146, 616 N.W.2d 1 (2000).

## V. EFFECT OF JOINT LEGAL AND PHYSICAL CUSTODY

### 1. MATERIAL CHANGE IN CIRCUMSTANCES

■ We have stated that in order to prevail on a motion to remove a minor child to another jurisdiction, the custodial parent must first satisfy the court that he or she has a legitimate reason for leaving the state. After clearing that threshold, the custodial parent must next demonstrate that it is in the child's best interests to continue living with him or her. *Jack v. Clinton, supra*; *Farnsworth v. Farnsworth, supra*. Dwight argues, however, that this standard should not apply where the parent seeking removal is not the sole "custodial parent," but instead shares joint legal and physical custody.

■ We defined the concepts of legal and physical custody, in the context of child support, in *Elsome v. Elsome*, 257 Neb. 889, 601 N.W.2d 537 (1999). We stated:

> Joint legal custody has been generally defined as joint " 'authority and responsibility for making "major" decisions regarding the child's welfare' " . . . . In contrast, joint physical custody has been described as "joint 'responsib[ility] for "minor" day-to-day decisions' and the exertion of continuous physical custody by both parents over a child for significant periods of time."

(Citations omitted.) *Id.* at 898, 601 N.W.2d at 544. There is no dispute that the instant case is one of joint legal and physical custody.

■ Dwight argues that because Cynthia seeks a modification of the custody arrangements, as well as leave to move to New York, Cynthia must first prove a material change in circumstances affecting the best interests of the children.

Ordinarily, custody of a minor child will not be modified unless there has been a material change of circumstances showing that the custodial parent is unfit or that the best interests of the child require such action. *Smith-Helstrom v. Yonker*, 249 Neb. 449, 544 N.W.2d 93 (1996). The party seeking modification of a decree of dissolution bears the burden of showing a material change of circumstances affecting the best interests of a child. *Parker v. Parker*, 234 Neb. 167, 449 N.W.2d 553 (1989). See, also, *Smith-Helstrom v. Yonker, supra.*

We agree that Cynthia, in seeking to modify the custody arrangement from joint legal and physical custody to sole custody, bears the burden of showing a material change in circumstances such that the best interests of the children require such action. We also determine, in accordance with long-established principles, that in order to further prevail on a motion to remove the minor children from the state, the relocating parent must first satisfy the court that she or he has a legitimate reason for leaving the state *and then* demonstrate that it is in the children's best interests to live with that parent in the new location. *Jack v. Clinton*, 259 Neb. 198, 609 N.W.2d 328 (2000). As a practical matter, the existence of a joint physical custody relationship is likely to make it more difficult for the relocating parent to meet these burdens. Nonetheless, whether we are considering a modification of custody or a proposed removal from the state, the best interests of the children are the paramount considerations in our determination. *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999).

Despite the children's best interests being the central concern, it is helpful to set forth appropriate factors to consider in analyzing the children's best interests in a proposed removal from Nebraska under joint custody circumstances. We have stated that removal of a child from the state, without more, does not amount to a change of circumstances warranting a change of custody. *State ex rel. Reitz v. Ringer*, 244 Neb. 976, 510 N.W.2d 294 (1994), *overruled on other grounds, Cross v. Perreten*, 257 Neb. 776, 600 N.W.2d 780 (1999). Nevertheless, when considered in conjunction with other evidence, such a move may well be a change of circumstances that would warrant a modification of the decree. *Marez v. Marez*, 217 Neb. 615, 350 N.W.2d 531

(1984). We hold that in cases of joint legal and physical custody, a legitimate reason for leaving the state, taken together with an expressed intent to do so, may constitute a material change in circumstances affecting the best interests of a child, sufficient to require examination of the best interests of the child.

To require that a parent, seeking leave to remove a child from the state, must prove a material change of circumstances beyond a legitimate reason and intent to move would (1) deny a parent with joint legal and physical custody the opportunity to seek leave to relocate prior to some change in another, unrelated circumstance and (2) would have the effect of sentencing such a parent to immobilization. See *Harder v. Harder*, 246 Neb. 945, 524 N.W.2d 325 (1994) (award of custody not to be interpreted as sentence to immobilization). Furthermore, such a rule would encourage parents to change the circumstances by moving without permission, presenting the court with a fait accompli demanding consideration of the issue. See *Jack v. Clinton, supra* (discouraging temporary relocation prior to ruling on permanent removal).

For these reasons, we conclude that the better rule is that a parent sharing joint legal and physical custody must first prove a material change in circumstances affecting the best interests of a child by evidence of a legitimate reason to leave the state, together with an expressed intention to do so. See, e.g., *Blaich v. Blaich*, 114 Nev. 1446, 971 P.2d 822 (1998); *McQuade v. McQuade*, 901 P.2d 421 (Alaska 1995); *Osteraas v. Osteraas*, 124 Idaho 350, 859 P.2d 948 (1993); *Voit v. Voit*, 317 N.J. Super. 103, 721 A.2d 317 (1998). Proving such an intent does not necessitate that physical custody be modified, but the intent to move illustrates the likelihood that there is a need for considering some sort of modification that would reflect the new circumstances. See *Osteraas v. Osteraas, supra*.

Once the party seeking modification has met this threshold burden, the separate analyses of whether custody should be modified and whether removal should be permitted necessarily become intertwined. In order to prevail on her motion to modify physical custody, Cynthia must show that such a modification is in the best interests of the children, and we cannot consider those best interests without considering the effect on the chil-

dren of the move to New York that Cynthia proposes to make. In short, because Cynthia seeks modification of custody so that she can move to New York, the questions whether modification is in the best interests of the children and whether the move to New York is in the best interests of the children inevitably merge into the single question whether the best interests of the children are furthered by Cynthia's obtaining sole physical custody and moving the children to New York.

## 2. BURDEN OF PROOF

We next consider the issue of what burden of proof should be applied where the party seeking removal does not have sole custody, but shares joint legal and physical custody. Generally, courts that have addressed shared physical custody cases treat them differently than cases involving a primary residential parent. See Janet Leach Richards, *Children's Rights v. Parents' Rights: A Proposed Solution to the Custodial Relocation Conundrum*, 29 N.M. L. Rev. 245 (1999). In such cases, courts are particularly reluctant to allow one parent to relocate with the children. Edwin J. Terry et al., *Relocation: Moving Forward, or Moving Backward?*, 10 J. Am. Acad. Matrim. Law. 167 (1998).

Several courts have held that when one party files a removal motion in a joint physical custody situation, neither party bears the burden of proving that relocation of the child is either favorable or detrimental to the child's best interests. Rather, each party carries an equal burden to prove that the new custody arrangement proposed by that party should be adopted by the court. *Id.* See, e.g., *In re Marriage of Burgess*, 13 Cal. 4th 25, 913 P.2d 473, 51 Cal. Rptr. 2d 444 (1996); *Ayers v. Ayers*, 508 N.W.2d 515 (Minn. 1993); *Jaramillo v. Jaramillo*, 113 N.M. 57, 823 P.2d 299 (1991); *In re Marriage of Chester*, 907 P.2d 726 (Colo. App. 1995). In those cases, an existing presumption in favor of allowing relocation of a custodial parent was deemed inappropriate in instances of joint physical custody. See *id.*

At least one court has determined that an existing presumption in favor of a custodial relocating parent should be reversed where joint physical custody is concerned, so that the relocating parent bears the burden of proving the benefits of the relocation.

See *Voit v. Voit*, 317 N.J. Super. 103, 721 A.2d 317 (1998). Other jurisdictions continue to apply a single test for relocation regardless of whether the parties have operated under a joint custody arrangement. See Terry et al., *supra*. See, also, e.g., *Blaich v. Blaich*, 114 Nev. 1446, 971 P.2d 822 (1998) (same burden placed on relocating parent regardless of joint custody); *McQuade v. McQuade*, 901 P.2d 421 (Alaska 1995) (best interests test applied de novo regardless of joint custody); *In re Marriage of Creedon*, 245 Ill. App. 3d 531, 615 N.E.2d 19, 185 Ill. Dec. 724 (1993) (statute establishing best interests test applied to all relocation cases).

Under Nebraska law, the burden has been placed on the custodial parent to satisfy the court that he or she has a legitimate reason for leaving the state and to demonstrate that it is in the child's best interests to continue living with him or her. See, *Jack v. Clinton*, 259 Neb. 198, 609 N.W.2d 328 (2000); *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999). Because the burden of proof in relocation cases is already placed on the parent seeking leave to relocate, it is unnecessary for us to reallocate that burden in cases of joint legal and physical custody. See *Blaich v. Blaich, supra.*

As noted earlier, as a practical matter, the existence of a joint physical custody relationship is likely to make it more difficult for a joint physical custodian to meet the burden associated with relocation. Compare *In re Marriage of Creedon*, 245 Ill. App. 3d at 537, 615 N.E.2d at 24, 185 Ill. Dec. at 729 ("to the extent that an order of joint custody actually reflects a closer than customary relationship between the noncustodian and the child, the existence of a joint custody order may be considered in determining whether removal is in a child's best interests"). This fact, however, is not attributed to a heightened burden of proof, but simply to the unavoidable practical consequences of joint legal and physical custody, and it is considered in the context of whether a proposed move is in the best interests of the child.

## VI. APPLICATION OF LAW TO FACTS

As previously stated, in order to prevail on a motion to remove a minor child to another jurisdiction, the custodial parent must first satisfy the court that he or she has a legitimate rea-

son for leaving the state. After clearing that threshold, the custodial parent must next demonstrate that it is in the child's best interests to continue living with him or her. *Jack v. Clinton, supra; Farnsworth v. Farnsworth, supra.* As determined above, this standard applies to the instant case despite the fact that Cynthia and Dwight share joint legal and physical custody and are thus both custodial parents.

### 1. LEGITIMATE REASON FOR LEAVING STATE

By determining this case on the basis of the best interests of the children, the district court implicitly determined that Cynthia had satisfied the threshold question whether she had a legitimate reason for leaving the state. See *Jack v. Clinton, supra* (emphasizing that parent seeking relocation must *first* satisfy court of legitimate reason for leaving state).

■ We have little difficulty concluding, in our de novo review, that the district court did not abuse its discretion in making this determination. We have concluded that a custodial parent's " 'firm offer of employment with a flexible schedule in close proximity to [the custodial parent's] extended family constitutes a legitimate reason' " in a removal case. *Jack v. Clinton,* 259 Neb. at 206, 609 N.W.2d at 334, quoting *Kalkowski v. Kalkowski,* 258 Neb. 1035, 607 N.W.2d 517 (2000). In this case, Cynthia presented evidence of a firm offer of employment at NYU that would enhance her career and evidence that her extended family lived in the New York area, thus meeting her burden of showing a legitimate reason to leave the state.

### 2. BEST INTERESTS OF CHILDREN

■ We have set forth three broad considerations ordinarily to be employed in determining whether removal to another jurisdiction is in a child's best interests: (1) each parent's motives for seeking or opposing the move; (2) the potential that the move holds for enhancing the quality of life for the child and the custodial parent; and (3) the impact such a move will have on contact between the child and the noncustodial parent, when viewed in the light of reasonable visitation arrangements. *Jack v. Clinton,* 259 Neb. 198, 609 N.W.2d 328 (2000); *Farnsworth v. Farnsworth,* 257 Neb. 242, 597 N.W.2d 592 (1999). We will

address each of these considerations in turn, as appropriately tailored to the present circumstance of joint legal and physical custody.

### (a) Each Parent's Motives

In the district court, there was no evidence presented which would allow us to conclude that either party was seeking to frustrate the custodial rights of the opposing party, or otherwise acting in bad faith. While Cynthia argues on appeal that Dwight is simply attempting to "dominate" the lives of the children, and Dwight argues that Cynthia does not really believe that her life would be improved by the NYU job, these arguments are unsupported by the evidence presented in the district court. Rather, the record depicts two parents who both care about their children and are trying to do what they believe is best for the children. We are unpersuaded by the interpretations of the record offered by the parties' counsel and conclude, in our de novo review, that each parent has quite valid reasons for taking their respective positions on the removal of the children from Nebraska. See *Farnsworth v. Farnsworth, supra.*

### (b) Quality of Life

In determining the potential that the removal to another jurisdiction holds for enhancing the quality of life of the parent seeking removal and of the children, we have previously considered several pertinent factors, including: (1) the emotional, physical, and developmental needs of the children; (2) the children's opinion or preference as to where to live; (3) the extent to which the relocating parent's income or employment will be enhanced; (4) the degree to which housing or living conditions would be improved; (5) the existence of educational advantages; (6) the quality of the relationship between the children and each parent; (7) the strength of the children's ties to the present community and extended family there; and (8) the likelihood that allowing or denying the move would antagonize hostilities between the two parties. See, *Jack v. Clinton, supra; Farnsworth v. Farnsworth, supra.* This list should not be misconstrued as setting out a hierarchy of factors. Depending on the circumstances of a particular case, any one factor or combina-

tion of factors may be variously weighted. *Farnsworth v. Farnsworth, supra.*

Not surprisingly, the parties have each chosen to emphasize different factors in applying the *Farnsworth* analysis to this case. Generally, Cynthia's argument rests upon the third, fourth, and fifth factors, as she urges this court to consider the benefits of the NYU employment offer and the advantages to the children of living in New York. Dwight relies more upon the sixth and seventh factors and argues that the advantages of the move, to the extent that they are present, are outweighed by the harm of separating the children from Dwight.

### *(i) Enhancement of Income or Employment*

With regard to the third factor, the extent to which Cynthia's income or employment will be enhanced, we note that Cynthia presented substantial evidence that the employment opportunity at NYU would offer her increased salary and benefits from her current position. Evidence was also adduced, however, that some of those benefits might be offset by the higher cost of living in the New York area, particularly with respect to the cost of obtaining adequate housing.

Although no evidence was presented showing that similar compensation would not be available in Nebraska, Cynthia did testify at length about her current and previous employment, and we conclude, in our de novo review, that Cynthia has presented evidence that her income and employment will be enhanced by the move to New York. This factor would weigh in favor of granting leave to relocate the children if Cynthia were granted sole custody, as the living conditions and employment opportunities for the mother are interwoven with the well-being of the custodial parent. See *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999).

### *(ii) Improvement of Housing or Living Conditions*

#### a. Housing

With regard to the fourth factor, the degree to which housing or living conditions would be improved, Cynthia's testimony was essentially unrebutted that adequate housing would be available in New York, comparable to the quality of the chil-

dren's current residences. As previously noted, however, Cynthia admitted that such housing was likely to be more expensive than in Lincoln. Available housing does not weigh in favor of or against the relocation and does not factor into our de novo review.

### b. Living Conditions—Cultural Opportunities

Cynthia argues that the metropolitan area of New York City, as compared to Lincoln, would present "virtually unlimited" educational, cultural, and entertainment opportunities. Cynthia thus argues that relocation to New York would improve the quality of life for the children. The essence of Cynthia's argument seems to be that New York City, culturally speaking, is the center of the universe.

We confronted a similar argument in *Farnsworth v. Farnsworth, supra,* in which the mother, seeking leave to relocate from Omaha, Nebraska, to Denver, Colorado, argued that Denver would offer access to a wider variety of outdoor activities and professional sporting events. We concluded that although access to such activities was commendable, the quality and quantity of access to such events was not significantly greater in Denver than in Omaha, and did not weigh this factor significantly in our de novo review. *Id.* See, also, *Carraher v. Carraher,* 9 Neb. App. 23, 33, 607 N.W.2d 547, 556 (2000) (declining to "put this court's 'Chamber of Commerce' seal of approval on residing in the mountains").

Although the evidence presented in the district court was sparse, we cannot disagree with the contention that New York has more museums, theaters, and other cultural and social activities than does Lincoln. The flaw in Cynthia's argument, however, is the conclusion that such opportunities suffice to improve the living conditions for the children. In the first place, Dwight adduced testimony that Cynthia had not taken advantage of the cultural and social opportunities available in Lincoln, and therefore, Dwight argues, we cannot assume that the availability of cultural activities in New York means that Cynthia will allow the children to take advantage of them.

Second, the dispositive question is not where the children will have more fun, but where the living conditions will further their

best interests. Simply put, the considerations one includes when choosing a vacation destination are not necessarily the same as those included when deciding where to raise a child. While Cynthia testified that New York offers more cultural and entertainment opportunities than does Lincoln, that testimony does not allow us to conclude that New York is, ipso facto, a better place to raise a child. See *Carraher v. Carraher, supra* (concluding that Estes Park, Colorado, and Wahoo, Nebraska, are undoubtedly different places, but declining to state that one is "better" than the other).

### c. Living Conditions—Racial Diversity

Cynthia further argues that the children, as members of a racial and ethnic minority, would be better off in the diverse population of New York than the less diverse community of Lincoln. The record does not specifically state to which minority group the children belong.

We have not previously discussed the degree to which racial identity might be weighed in the context of custody determinations. The Nebraska Court of Appeals, however, recently confronted a similar question in *Ebirim v. Ebirim*, 9 Neb. App. 740, 620 N.W.2d 117 (2000). In that child custody dispute, the father argued that his son's biracial heritage should be considered in determining custody and that the child should have been placed with him because he lived in the racially diverse community of Omaha, while the mother lived in Brownville, Nebraska, which the mother testified had no African-American children. *Id.*

The Court of Appeals determined that "the collected cases indicate that [race] is generally considered as one factor among several in evaluating the best interests of the child," *id.* at 743, 620 N.W.2d at 121, and concluded that the race of the child could be considered as "one factor among several . . . in custody determinations," *id.* at 744, 620 N.W.2d at 121, citing Annot., 10 A.L.R.4th 796 et seq. (1981). Accord *J.H.H. v. O'Hara*, 878 F.2d 240 (8th Cir. 1989), *cert. denied* 493 U.S. 1072, 110 S. Ct. 1117, 107 L. Ed. 2d 1024 (1990). Compare *Palmore v. Sidoti*, 466 U.S. 429, 104 S. Ct. 1879, 80 L. Ed. 2d 421 (1984) (finding Equal Protection Clause violated where race of child was *sole factor* in making custody determination).

■■■ We agree with the Court of Appeals and likewise conclude that a child's racial identity is one factor among several that may be considered in making custody determinations. In the instant case, we conclude that the relative racial diversity of Lincoln and New York is an appropriate consideration in evaluating the living conditions for the children.

Based on the evidence presented to the district court, however, we do not find that racial identity and diversity should be given significant weight in our de novo review. Cynthia admitted that the children had not been taunted or otherwise discriminated against in Lincoln, and Dwight testified that Dwight III's school was racially diverse. While Cynthia testified that the "New York City metropolitan area" was more racially diverse than Lincoln, no evidence was adduced regarding the schools or neighborhoods of Suffolk County, where Cynthia planned to live, nor was any evidence presented regarding the general state of race relations, or instances of racial discrimination, in New York City. The record indicates that with respect to diversity, the living conditions of the children are satisfactory in Lincoln, given that there is no evidence of discrimination and that their local school is ethnically diverse. Based on the record presented, we cannot conclude that the greater racial diversity of the New York City metropolitan area would improve the living conditions for the children.

### (iii) Educational Advantages

With respect to the fifth factor, the existence of educational advantages for the children, Cynthia testified generally that the schools in Suffolk County, New York, would be adequate for the needs of the children. No evidence was adduced that the primary and secondary schools in New York were any better or worse than the schools in Lincoln. Cynthia argues that the availability of a free education at NYU is an educational advantage for the children, although she conceded that this opportunity would be available to the children regardless of whether or not they lived with her in New York. Because Cynthia testified that she would not take the NYU job unless allowed to take the children with her, we must assume that the opportunity to attend NYU for free would be lost to the children if Cynthia was denied leave to take

them to New York. Nonetheless, we cannot conclude that such a factor should be given significant weight in our de novo review, given the current age of the children and the consequent remoteness and unpredictability of their possible postsecondary education.

### (iv) Quality of Relationship Between Children and Parents

The sixth factor, the quality of the relationship between the children and each parent, is relied upon by Dwight in his opposition to relocation. Although each party pointed to flaws of the opposing party in district court, the parties' consistent testimony established that both parents are actively involved in the lives of their children. It is uncontested that the children spend approximately half their time with each parent and that both parents have been intimately involved in all aspects of raising the children.

Cynthia relies on the fact that Dwight was, at the time of hearing, behind in his child support payments. We have stated, however, that as a general rule, the custodial parent's right of support and the noncustodial parent's right of visitation are entitled to separate enforcement. *Welch v. Welch*, 246 Neb. 435, 519 N.W.2d 262 (1994). Although stated in terms of visitation, the principle is equally applicable to custodial determinations. While we consider Dwight's child support arrearage in our de novo review, we do not consider it as a significant reason to modify custody from Dwight to Cynthia under the circumstances of this case.

Testimony from several witnesses established that Dwight has very close relationships with both children. While moving to New York would preserve the relationship of the children with Cynthia, the move would, as discussed in more detail later in this opinion, detrimentally affect the close relationship between Dwight and the children. We also note that Cynthia's proposed schedule at NYU, working the evening shift, would seem to interfere, especially during the school year, with Cynthia's own ability to maintain her relationship with the children.

Overall, this factor in our de novo review weighs significantly against relocation of the children.

### (v) Ties to Community and Extended Family

The evidence adduced in the district court indicated that living in New York would place the children closer to Cynthia's extended family and some of Dwight's extended family, who live generally in the New York City and Philadelphia metropolitan areas. Dwight also testified, however, that his remaining extended family lives in the Lincoln area. No evidence was adduced regarding the ties of the children in the community, other than some brief testimony regarding Dwight III's friends at school.

Members of the extended family of the children live in both Lincoln and New York. Furthermore, we note that although Cynthia had no other children, Dwight and Shelley had another child, and Shelley was pregnant at the time of the hearing. In considering the familial relationships of the children, we would be remiss if we did not consider the relationship of the children to their younger siblings. Allowing the children greater contact with members of Cynthia's and Dwight's extended families must be balanced against contact with Dwight's remaining extended family and, perhaps most importantly, the children's siblings. In balance, we conclude that this factor does not weigh significantly for or against permitting relocation of the children.

### (vi) Remaining Factors

There is little dispute over the remaining factors. Both parents essentially concede that the emotional, physical, and developmental needs of the children can be met by either party. There is no evidence which would allow us to determine if allowing or denying the move would antagonize hostilities between the parties, given that, aside from the dispute over relocation, the parties seem to have established a relatively positive and commendable relationship where the welfare of the children is concerned.

### (vii) Quality of Life—Conclusion

In our de novo review, we conclude that while Cynthia presented evidence that the quality of life for the children might be improved by certain aspects of living in New York, this improvement would be offset, if not outweighed, by the effect of dimin-

ishing the relationship between Dwight and the children. The district court did not abuse its discretion in finding that the quality of life would not be improved for the children by the move to New York.

### (c) Impact of Move on Contact Between Dwight and Children

The final consideration is the impact of relocation upon Dwight's ability to maintain a meaningful relationship with his children. See, *Jack v. Clinton*, 259 Neb. 198, 609 N.W.2d 328 (2000); *Kalkowski v. Kalkowski*, 258 Neb. 1035, 607 N.W.2d 517 (2000); *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999). Cynthia's testimony in the district court established that she was willing to permit Dwight extensive visitation during summer and school holidays and to pay some of Dwight's travel expenses.

Nonetheless, it cannot be questioned that the move to New York would dramatically affect Dwight's contact with the children. As we stated in *Kalkowski v. Kalkowski*, 258 Neb. at 1047, 607 N.W.2d at 527:

> We conclude that the question turns on the third *Farnsworth* consideration, i.e., the impact of relocation upon the ability of Kelly to maintain a meaningful relationship with his children. In *Farnsworth*, we noted that while a move from Omaha to Denver would necessarily lessen the frequency of visits with the child, the distance between the two cities was not one which would prevent the noncustodial parent from seeing his child on a regular basis. The same cannot be said of the distance between Ogallala, Nebraska, and Camrose, Alberta, Canada. The greater distance, less direct travel connections, and the significant expense and time involved in traveling between the two locations are significant factors which the trial court properly considered.

The instant case presents similar considerations. Although the availability of travel connections is greater between Lincoln and New York, the distance, expense, and time involved in such travel is appropriately considered in evaluating the degree to which the move would affect Dwight's contact, and relationship, with his children.

Although Cynthia made substantial and commendable concessions on the issue of visitation, it cannot be reasonably questioned that such visitation would allow Dwight significantly less contact with the children and would make it nearly impossible for him to maintain the relationship that he currently enjoys. Cynthia's proposed visitation schedule, while generous, would nonetheless be a poor substitute for the daily interaction Dwight and the children now share. This consideration is significant in our de novo review, given the context of joint legal and physical custody.

### (d) Best Interests—Conclusion

After our de novo review of the record, detailed above, we cannot conclude that the district court abused its discretion in finding that it was not in the best interests of the children to permit Cynthia to relocate with them to New York. Although Cynthia has a legitimate reason for leaving the state, and certain aspects of living in New York would improve the quality of life for the children, the district court did not abuse its discretion in determining that those facts were outweighed by the detrimental effect that the move would have on the relationship of the children with Dwight. Cynthia's sole assignment of error is without merit.

### VII. CONCLUSION

The evidence reveals two loving parents actively involved in the lives of two well-adjusted children operating under a commendable joint legal and physical custody arrangement. For the reasons discussed above, we conclude on the basis of our de novo review that the district court did not abuse its discretion in determining that Cynthia did not show the best interests of the children would be served by modifying custody and granting her leave to move with the children to New York. We therefore affirm the judgment of the district court. The parties' respective motions for attorney fees on appeal are denied.

AFFIRMED.

WRIGHT, J., concurring in the result.

I concur in the result. In my opinion, where the parties have joint legal and physical custody, the burden of proof is upon the party seeking to relocate to first show there has been a material change in circumstances that would justify a change in the cus-

tody arrangement. Custody is the first issue that must be decided. Obviously, relocation of the children would amount to a modification of custody by transferring physical custody to the parent who desires to relocate. Therefore, I would require the parent who desires to relocate to prove that the new custody arrangement should be adopted by the court.

CONNOLLY, J., joins in this concurrence.