Clinton M., appellee, v. Paula M., appellant.
___ N.W.2d ___

Filed April 1, 2014.    No. A-12-920.

1. **Child Custody: Appeal and Error.** Child custody determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion.

2. **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

3. **Child Custody.** In order to prevail on a motion to remove a minor child to another jurisdiction, the custodial parent must first satisfy the court that he or she has a legitimate reason for leaving the state. After clearing that threshold, the custodial parent must next demonstrate that it is in the child's best interests to continue living with him or her.

4. **Child Custody: Proof: Intent.** In circumstances where parents share joint legal and physical custody and one parent seeks to remove a child from the state, the parent seeking modification must first prove a material change in circumstances affecting the best interests of the child by evidence of a legitimate reason to leave the state, together with an expressed intention to do so; once the party seeking modification has met this threshold burden, the separate analyses of whether custody should be modified and whether removal should be permitted become intertwined.

5. **Child Custody.** In cases where a noncustodial parent is seeking sole custody of a minor child while simultaneously seeking to remove the child from the jurisdiction, a court should first consider whether a material change in circumstances has occurred and, if so, whether a change in custody is in the child's best interests. If this burden is met, then the court must make a determination of whether removal from the jurisdiction is appropriate.

6. ____. Ordinarily, custody of a minor child will not be modified unless there has been a material change in circumstances showing that the custodial parent is unfit or that the best interests of the child require such action.

7. **Child Custody: Proof.** The party seeking modification of child custody bears the burden of showing a material change in circumstances.

Appeal from the District Court for Sarpy County: Max Kelch, Judge. Affirmed.

Justin A. Quinn and Casey J. Quinn for appellant.

Gerald D. Johnson and Maxwell Crawford, Senior Certified Law Student, of Johnson & Pekny, L.L.C., for appellee.

Inbody, Chief Judge, and Moore and Riedmann, Judges.

INBODY, Chief Judge.

## INTRODUCTION

Paula M. appeals the decision of the Sarpy County District Court denying her request to modify the parties' dissolution decree to grant her sole legal and physical custody of the parties' minor child and denying her request to remove the child from Nebraska to California.

## STATEMENT OF FACTS

Clinton M. and Paula were married on March 21, 1998. They had one child, Alexis M., who was born earlier that year in February. The parties' marriage was dissolved by a decree entered on August 8, 2002, by the 26th Judicial District Court, Bossier Parish, Louisiana. The decree granted the parties joint legal and physical custody of Alexis. The decree was modified in December 2006 by the Circuit Court of Pulaski County, Arkansas, to award sole custody of Alexis to Clinton, with Paula's visitation restricted to Arkansas. Another modification occurred in July 2008, wherein the Arkansas court granted Paula specific parenting time with Alexis.

On April 2, 2009, Clinton filed a complaint to register these foreign judgments in the Sarpy County District Court. He contemporaneously filed a complaint to modify the parties' dissolution decree, requesting that Paula's parenting time be restricted to the State of Nebraska and that Paula be ordered to provide support in accordance with the Nebraska Child Support Guidelines. Paula filed a countercomplaint to modify, requesting sole legal and physical custody of Alexis and requesting that she be allowed to remove Alexis from Nebraska to California, where Paula resides. Trial on both Clinton's complaint and Paula's countercomplaint was held on August 30, 2012. The parties stipulated prior to the start of trial that due to the significant travel involved with parenting time, regardless of who had custody of Alexis, a deviation from the child support guidelines down to a support amount of zero was appropriate.

The evidence at trial established that Alexis suffers from serious mental health issues. Due to these issues, in January 2008, Clinton, a member of the U.S Air Force, was reassigned

to Nebraska from Germany because Alexis' mental health providers at the Air Force base did not feel that they could properly care for her there. The record reflects that Alexis, now 16 years old, has been diagnosed with bipolar mood disorder, posttraumatic stress disorder, attention deficit hyperactivity disorder, reactive attachment disorder, oppositional defiant disorder, and cerebral dysrhythmia, which is abnormal electrical activity in the brain which could contribute to a mood disorder and anger outbursts. Alexis has also suffered from depression, explosive anger outbursts, and a mood disorder.

Alexis' conditions have required professional assistance, which she has received from various providers, including Dr. Jamie Ryder, a psychologist who provided individual therapy every other week for Alexis from September 2009 until June 2012; Bridgette Maas, who provided weekly family therapy from December 2010 until January 2012; and Amy Jackson, Alexis' primary therapist from April 13 through July 11, 2012. Each of these providers testified at trial.

As a result of her mental health issues, Alexis has exhibited symptoms of racing thoughts, mood swings, and low motivation, and she has major difficulties with impulse control and emotional regulation. Her behaviors have included lying, manipulation, refusing to follow rules, hoarding food, stealing, wetting and defecating herself, destroying property, making self-harm statements, and exhibiting aggressive behavior toward others, including Clinton's wife and Alexis' younger half sister, and generally displaying out-of-control, noncompliant, and defiant behaviors. Clinton testified that throughout the majority of her life, Alexis' behaviors have been "up and down"; she has some "good" days, while on other days, she is angry, disobedient, and difficult to manage.

Alexis' behaviors reached a critical point in the spring of 2011, when the following event occurred: Alexis and Clinton's wife were arguing when Alexis allegedly pushed her down a flight of stairs, rendering her unconscious, and then Alexis proceeded to leave the home without notifying anyone of Clinton's wife's condition. This event resulted in Alexis' being admitted into an acute treatment facility and the recommendation that Alexis receive treatment at a residential

facility due to her increasing violent tendencies. Pursuant to this recommendation, in mid-March, Alexis began residential treatment at a children's treatment center in Kansas City, Missouri, which provides intensive inpatient behavioral treatment. Alexis was discharged from the treatment center in September 2011.

After being discharged from the treatment center, Alexis did very well, initially: She went back to school and started running in cross-country and swimming. However, Alexis then became depressed and started getting angry, isolating herself, not listening, and having problems at school. In October 2011, after a disagreement with Clinton and his wife, Alexis went into her room, cut her hair with a box cutter, and crawled onto the roof of the home, with the end result of police searching for her. After this episode, Alexis was admitted into an acute treatment facility. Throughout the fall of 2011, Alexis' behaviors continued.

Despite Alexis' behaviors, Ryder felt that a trial visit allowing Alexis to visit Paula in California would be beneficial, so it was arranged for Alexis to visit Paula over Christmas break. Although Alexis ended up attending the visit as scheduled, there were two significant incidents prior to her leaving for the visit. The first incident occurred in a family therapy session with Maas in which Alexis stated that she was not sure whether she could stay safe at Paula's home and that she was worried she might kill Paula's 2½-year-old disabled son. Maas and Alexis came up with a safety plan, which Alexis took with her to California, and Maas spoke with Paula about how to make sure Alexis was safe at Paula's home. The second incident occurred the day before Alexis was supposed to leave for California. Alexis got a kitchen knife and attempted to stab her way into her 4-year-old half sister's room, carved scratches into the door, and left the knife stuck in the door. Alexis told Maas that she was very angry, that she was mad at her younger half sister because she got a lot of attention, that Alexis herself wanted attention, and that she wanted to hurt her half sister. She also said that she was scared to go to Paula's home and that if she had been able to get her half sister's locked door open, she would have hurt her.

As a result of Alexis' threatening behavior toward her younger half sister, Clinton sought to have Alexis admitted to an acute treatment facility; however, Alexis' treating psychiatrist felt that Alexis was attempting to sabotage her visit with Paula and recommended that Alexis visit Paula in California as planned. Following this recommendation, Alexis was not admitted to the facility and went to California for the visit as planned. At the conclusion of the visit, it was reported by both Paula and Alexis that the visit went well and that there were no problems. Despite telling her family therapist that she had fun and was excited about the visit, after returning, Alexis became angry and ripped up pictures of Paula, Paula's older daughter, and Paula's son. Alexis told Maas that she was angry at Paula's son because he was "cute" and "got so much attention" and that she did not get the same attention when she was a child.

Although the California visit went well, due to Alexis' behaviors, Clinton pursued another residential placement for Alexis. The residential placement recommended by Clinton's insurance was Meridell Achievement Center (Meridell) in Liberty Hill, Texas. Alexis was admitted to Meridell, a 24-hour nursing psychiatric facility/residential program, on January 23, 2012. Therapists at Meridell initiated the idea of Clinton's requesting the Air Force for a transfer to Texas in order to more fully participate in Alexis' therapy. Clinton requested a transfer in March 2012, due to medical necessity. His request was approved in mid-June, and later that month, he relocated to Texas, arriving on June 30. Paula testified that although Clinton had decided to place Alexis in residential treatment in Texas, she was not consulted prior to Alexis' admission at Meridell, that Paula was initially informed about Alexis' admission from Ryder, and that Clinton informed her only after Alexis had already been admitted to Meridell.

While at Meridell, Alexis received individual, family, recreational, and group therapy, as well as medication management. Jackson, Alexis' primary therapist at Meridell, saw Alexis for therapeutic treatment, providing individual therapy at least once per week, family therapy twice per week, and group therapy four times per week from April through

July 2012. Jackson testified that during Alexis' treatment at Meridell, Alexis made progress in terms of mood management, developing better coping skills to deal with depression and anger, developing better peer relationships, and developing a better working relationship with her family. However, Jackson felt that even after Alexis was released, she would probably need to go back into residential treatment, which Jackson testified was not unusual for children when they have had long-term difficulties and reach different stages of development.

In fact, after being discharged from Meridell on July 11, 2012, Alexis spent approximately 6 days at home and began a partial program where she would spend the day in therapy and then return home in the evening. However, on July 17, Alexis was admitted into an acute treatment facility due to homicidal threats and her unwillingness to agree to a safety plan. Alexis was released from the facility on July 23, and returned to the partial program the following day. On August 6, after returning home after spending the day at the partial program, Alexis was readmitted to the acute treatment facility after she told Clinton that she was feeling very depressed and that she thought she might hurt herself and requested that Clinton take her to the facility to be evaluated. Alexis was transferred from the acute treatment facility to the residential treatment program, where she remained up until the time of trial.

Ryder testified that throughout Alexis' therapy, she had patterns and mood swings where she would alternate between idolizing one parent and vilifying the other and, depending on her mood, would alternate between wanting to live with Paula and not wanting to live with her. Alexis' mood swings could change from hour to hour, she would sabotage situations in her life, and when things were going well or her mood changed or something upset her, she was likely to react very negatively. Alexis admitted to sabotaging when she was uneasy or nervous or unsure of herself. Additionally, Ryder acknowledged that Alexis could be extremely violent when she is angry. Alexis' anger was described by Maas as a rage: When angry, Alexis becomes impulsive and irrational,

and has mood swings ranging from crying to anger to being very violent.

An example of Alexis' mood swings was a spring 2010 in-person visit to Ryder's office by Paula and her older daughter and son. Ryder testified that prior to the visit, Alexis seemed to be very happy and excited; then, the day prior to the visit, she became resistant, running away from school the day of the visit, and then refusing to see Paula's other children. Ryder reported that despite this, once Alexis was convinced to come into the office for the visit, the visit went very well from all outward appearances: Alexis seemed happy, she was very engaged, and she was "[v]ery loving" with both Paula and her other children. However, the morning after the visit, Alexis left Ryder a voicemail in which she stated that she was scared and worried that Paula was going to try to "kidnap" her again and in which she refused to come to another visit that had been scheduled. When Ryder called to speak to Clinton, he reported that almost immediately after Alexis got home from the visit, she became very upset and distraught and "broke down," saying that she had been uncomfortable and anxious and that the visit "went horribly." Ryder testified that there was no actual danger to Alexis posed by Paula, but that the problem was caused by Alexis' perception of the events and her fluctuating moods.

Ryder testified that stability and consistency in the home and cooperation with the therapist are essential in the treatment of a child like Alexis, and both Ryder and Jackson agreed that Clinton and Paula actively participated in Alexis' therapy. Paula participated in family therapy telephonically, and she traveled for in-person family therapy, often at her own expense. Ryder testified that Clinton tried very hard to cooperate and provide stability and consistency in Alexis' treatment, that Alexis was always at her appointments and always on time, that Clinton provided updates and participated in Alexis' treatment, and that he worked very hard to look at different ways of parenting and different ways of dealing with the situation to try to help Alexis. Additionally, Ryder testified that she believes that Clinton loves Alexis very much, has her best interests at heart, and, to the best of his ability, has tried a lot of the things that

have been recommended as far as parenting Alexis. Ryder testified that Clinton expressed he wanted Alexis to have a good relationship with Paula and to have contact with her and that he never did anything to suggest he was trying to keep Alexis from having a relationship with Paula. Similarly, Maas testified that she was never concerned about Clinton's "shutting out" Paula or keeping her from participating in Alexis' therapy and that he has always been positive about Alexis' treatment and "staying on top of the goals."

Ryder noted that Alexis has exhibited behaviors in multiple settings, both in Clinton's home and in residential treatment, although the behaviors exhibited at home were more severe. Ryder explained that this would not be unusual, because residential treatment environments are significantly more structured environments than a home setting and, additionally, there is peer pressure to behave because if a child misbehaves, not only is the child punished, but all of the child's peers are punished. There can also be a "honeymoon period" which can last for several months when children go into residential treatment; this "honeymoon period" can also be exhibited on a visit with a noncustodial parent.

Jackson testified that when transitioning a child from residential treatment back into the home, the most important support is for the parent to provide the child a home environment that is consistent and safe, to make sure there are opportunities for ongoing therapy to assist in the transition, to be mindful of the child's psychiatric difficulties and understand the possible impact on parenting, and to be mindful of the parent's frustrations and feelings and evaluate whether he or she is doing what is best for the child. However, Maas testified that based upon Alexis' history, Alexis will probably continue to struggle more with her custodial family members than her noncustodial family, because she resides with them and they can see her moods fluctuate, they deal with her behaviors, and they are working with her school and physicians and are implementing rules.

Both Clinton and Paula testified that they thought it was in Alexis' best interests to be with their respective families. Paula testified that she believed that it is in Alexis' best

interests to be with her, because although Alexis has been in Clinton's home for the past 3½ years, her behaviors have continued to get worse and there continue to be safety concerns regarding people in the home. Therefore, Paula believes that Alexis should be given the opportunity to live with her to see whether Alexis can do better. Paula testified that if the court were to grant her custody, she would want Alexis to remain at the inpatient treatment center until her doctors determine that she could return home. Paula testified that she has investigated the possibility of Alexis' receiving treatment in California and has found that similar programs such as day programs, inpatient programs, acute treatment hospitals, residential facilities, and therapists are available. Paula conceded that it was possible that Alexis would act out in her home, but she stated that "[n]obody knows." She further stated that Alexis, who was 14 years old at the time of trial, is very close with Paula's older daughter, who was 17 years old and a senior in high school at the time, and that her older daughter is a positive influence on Alexis.

Clinton testified that he and his wife are best suited to care for Alexis, stating:

> We've gone through every therapy session with [Alexis]. We've talked to all the providers. We do exactly what they tell us to do. I mean we're best suited. We do our best to always be consistent with her. And we love her. And all we want is her to just have a more normal life.

Further, upon being asked about the ongoing behaviors and violence that Alexis has displayed in his home and why he wants Alexis to remain in his home, Clinton testified:

> I love [Alexis], and we've been trying to help her through this very tough situation. And we've grown to be able to — the way I look at it is we're handling it. We're taking care of her. We're doing our best for her. We're trying to give her the kind of home that she needs, the stability and consistency.

On September 5, 2012, the district court entered an order noting that in April 2009, Clinton registered the aforementioned foreign orders from Louisiana and Arkansas in the Sarpy County District Court. The order denied both Clinton's

complaint to modify and Paula's countercomplaint to modify, which had requested sole custody of Alexis and removal of Alexis to California. Regarding Paula's countercomplaint, the court specifically found that the evidence reflected Clinton was a fit parent and that the evidence was insufficient to find that a change in custody would be in Alexis' best interests. The district court's order also stated:

> [T]he State of Nebraska has not issued any permanent order in regard to custody. . . . As a result . . . this matter is controlled by State ex rel. Pathammavong v. Pathammavong, 268 Neb. 1 (2004), where the Supreme Court held that removal is an issue only when there has been a previous order of custody entered in this State.

Paula has timely appealed to this court.

## ASSIGNMENT OF ERROR

Paula contends that the district court erred in denying her countercomplaint to modify custody and to allow removal of Alexis from Nebraska.

## STANDARD OF REVIEW

[1,2] Child custody determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Watkins v. Watkins*, 285 Neb. 693, 829 N.W.2d 643 (2013). An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id*.

## ANALYSIS

We note that the instant case presents an unusual factual situation wherein the noncustodial parent is seeking sole custody of a minor child while simultaneously seeking to remove the child from the jurisdiction.

[3,4] In most cases in which a parent is seeking to remove a child from the jurisdiction, the parent is the custodial parent. Our removal jurisprudence provides that in order to prevail on a motion to remove a minor child to another jurisdiction, the

custodial parent must first satisfy the court that he or she has a legitimate reason for leaving the state. After clearing that threshold, the custodial parent must next demonstrate that it is in the child's best interests to continue living with him or her. *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999). The standard is modified where parents share joint legal and physical custody and one parent seeks sole custody and simultaneously seeks removal of the child from the jurisdiction. See *Brown v. Brown*, 260 Neb. 954, 621 N.W.2d 70 (2000). In circumstances where parents share joint legal and physical custody, the parent seeking modification must first prove a material change in circumstances affecting the best interests of the child by evidence of a legitimate reason to leave the state, together with an expressed intention to do so; once the party seeking modification has met this threshold burden, the separate analyses of whether custody should be modified and whether removal should be permitted become intertwined. See *id*.

However, another approach was suggested in a concurrence in *Brown*, authored by Justice Wright and joined by Justice Connolly. Justice Wright noted that relocation of a child would obviously result in a modification of custody by transferring physical custody to the parent who desired to relocate. Thus, Justice Wright expressed that where parties have joint legal and physical custody, custody is the first issue which should be decided, with the burden of proof on the party seeking to relocate to first show there had been a material change in circumstances that would justify a change in the custody arrangement. *Brown v. Brown, supra* (Wright, J., concurring; Connolly, J., joins).

[5] Additionally, we recently considered a case which presented a factual situation similar to that presented in the instant case. In *State on behalf of Savannah E. & Catilyn E. v. Kyle E.*, 21 Neb. App. 409, 838 N.W.2d 351 (2013), the noncustodial parent filed a motion requesting to be awarded primary physical custody of the parties' two minor children and simultaneously requesting to remove the minor children from the jurisdiction. We held that in cases where a noncustodial parent is seeking sole custody of a minor child while simultaneously

seeking to remove the child from the jurisdiction, a court should first consider whether a material change in circumstances has occurred and, if so, whether a change in custody is in the child's best interests. If this burden is met, then the court must make a determination of whether removal from the jurisdiction is appropriate. *Id*. We affirmed the decision of the district court modifying custody and granting permission to remove the minor children from the jurisdiction.

In the instant case, since Paula has requested both to modify custody and to remove Alexis from the jurisdiction, we first consider whether custody should be modified, prior to a determination of the removal issue.

*Denial of Countercomplaint*
*to Modify Custody.*

Paula contends that the district court erred in denying her countercomplaint to modify custody.

[6,7] Ordinarily, custody of a minor child will not be modified unless there has been a material change in circumstances showing that the custodial parent is unfit or that the best interests of the child require such action. *Watkins v. Watkins*, 285 Neb. 693, 829 N.W.2d 643 (2013); *Heistand v. Heistand*, 267 Neb. 300, 673 N.W.2d 541 (2004). The party seeking modification of child custody bears the burden of showing a material change in circumstances. *Vogel v. Vogel*, 262 Neb. 1030, 637 N.W.2d 611 (2002); *Wild v. Wild*, 13 Neb. App. 495, 696 N.W.2d 886 (2005).

The evidence at trial established that Clinton is a parent who has been actively engaged in seeking out, and participating in, the appropriate mental health treatment for Alexis. He has provided, to the best of his ability, a stable and consistent home environment for Alexis and implemented suggestions from therapists for parenting Alexis. Further, although there is room for improvement in the communication between Clinton and Paula, there is no evidence that Clinton has either interfered with Paula's parenting time with Alexis or prevented or otherwise interfered with Paula's participation in Alexis' mental health treatment. Thus, Paula failed to show that Clinton was an unfit parent.

Further, the evidence presented established that Alexis suffers from severe mental health conditions which have been ongoing for an extended period of time; these issues do not appear to be specifically related to her environment. Alexis has exhibited behaviors both at home and at residential treatment, and, although her behaviors at home are more severe, Ryder pointed out that residential treatment, by its nature, is a significantly more structured environment than a home setting and that there is also peer pressure to behave because if a child misbehaves, the child and all of the child's peers are punished. Ryder also referenced a "honeymoon period" which can take place when a child enters a new environment such as residential treatment or a visit with a noncustodial parent. Further, the evidence establishes that concern for the safety of Alexis' family cannot be limited to Clinton's family; although the record does not show that Alexis has physically assaulted anyone in Paula's home, the record did reflect that Alexis expressed an ideation of killing Paula's son. Although Paula points to evidence that Alexis wants to reside with her, the evidence is clear that Alexis has mood swings and routinely changes her position on Clinton and Paula, alternating between idolizing one parent and vilifying the other. Alexis, while in Clinton's custody, has been provided a stable and consistent home and has been provided mental health care consistently. The difficulties faced by Alexis are not a product of a lack of effort by Clinton; they are a product of the disease from which she suffers. Paula has failed to establish that it would be in Alexis' best interests for custody to be modified. Having concluded Paula failed to prove a material change in circumstances showing that Clinton is unfit or that Alexis' best interests require such action, we find that this assignment of error is without merit.

## Denial of Motion to Remove
## Alexis From Jurisdiction.

Because we have determined that the district court properly denied Paula's motion to modify custody, it follows that we must also find that her motion to remove was properly denied because Paula does not have custody of Alexis.

## CONCLUSION

Based upon our de novo review of the record, the district court properly denied Paula's countercomplaint to modify, which had requested sole custody of Alexis and removal of Alexis to California. Therefore, the decision of the district court is affirmed.

Affirmed.

———————————

State of Nebraska, appellee, v.
William W. Matthews, appellant.
___ N.W.2d ___

Filed April 1, 2014.    No. A-12-1052.

1. **Constitutional Law: Statutes: Judgments: Appeal and Error.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make such discretion a factor in determining admissibility.

2. **Rules of Evidence: Appeal and Error.** Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, the admissibility of evidence is reviewed for an abuse of discretion.

3. **Judges: Words and Phrases.** A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition.

4. **Jury Instructions.** Whether jury instructions given by a trial court are correct is a question of law.

5. **Judgments: Appeal and Error.** When dispositive issues on appeal present questions of law, an appellate court has an obligation to reach an independent conclusion irrespective of the decision of the court below.

6. **Self-Defense.** To successfully assert a claim of self-defense as justification for the use of force, the defendant must have a reasonable and good faith belief in the necessity of such force and the force used must be immediately necessary and must be justified under the circumstances.

7. ____. A determination of whether the victim was the first aggressor is an essential element of a self-defense claim.

8. **Self-Defense: Evidence: Proof.** Evidence of a victim's violent character is probative of the victim's violent propensities and is relevant to the proof of a self-defense claim.

9. **Rules of Evidence.** Neb. Rev. Stat. § 27-404 (Reissue 2008) provides that a defendant may present evidence of a pertinent trait of a victim's character to show that the victim acted in conformity therewith on a particular occasion.