IN THE COURT OF APPEALS OF THE STATE OF IDAHO
Docket No. 42164

| | | |
|---|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENTAL RIGHTS OF JANE (2014-12) DOE. | ) ) ) | |
| JOHN DOE and JANE DOE I, | ) | |
| | ) | 2014 Opinion No. 69 |
| Petitioners-Respondents, | ) | |
| | ) | Filed: August 25, 2014 |
| v. | ) | |
| | ) | Stephen W. Kenyon, Clerk |
| JANE (2014-12) DOE, | ) | |
| | ) | |
| Respondent-Appellant. | ) | |
| | ) | |

Appeal from the Magistrate Division of the District Court of the Fifth Judicial District, State of Idaho, Jerome County. Hon. Thomas H. Borresen, Magistrate.

Decree terminating parental rights, affirmed.

Stacey DePew, Jerome, for appellant.

James C. Meservy of Williams, Meservy & Lothspeich, LLP, Jerome, for respondents.

---

MELANSON, Judge

Jane (2014-12) Doe (the mother) appeals from the magistrate's decree terminating her parental rights as to her daughter. For the reasons set forth below, we affirm.

## I.

## FACTS AND PROCEDURE

John Doe and Jane Doe I, the maternal grandparents of the child, filed a petition for termination of the mother's parental rights and adoption of the child. The Does claimed that the mother had abandoned and neglected the child. A hearing on that petition was held at which the Does and the mother testified. The testimony presented at the hearing established the following facts. The child at the center of this case was born to the mother on December 29, 2004. The father of the child is not known, despite two DNA tests. After the mother took the child home from the hospital, Jane would regularly stop by the mother's apartment to assist with caring for

1

the child, including taking the child to the Does' home three to four times a week. On several occasions, Jane found the mother oblivious to the child's cries and, on at least one occasion, Jane found the mother passed out. The Does began paying for daycare for the child when the child was two weeks old, which the mother obtained because she was on probation and working. During this time, the mother was attending beauty school during the day. Jane testified that she would take the child to daycare, visit the child at daycare during her lunch hour, and pick the child up at the end of the day.

Testimony revealed that the mother struggled with drug and alcohol addiction beginning before the child was born, resulting in repeated legal issues. Jane testified that the child was born with fetal alcohol syndrome, which caused vision and dental issues that the Does paid to have corrected. The Does began caring for the child full-time approximately one month after the child was born as a result of the mother's incarceration for driving under the influence in February 2005, which continued until approximately June 2005. The mother had no contact with the child during her incarceration. The Does obtained temporary guardianship of the child at the behest of the Idaho Department of Health and Welfare shortly after the mother was incarcerated in order to avoid having the child placed in foster care. The Does were granted permanent guardianship of the child, with the mother's consent, on June 6, 2005, and they remained guardians at the time of trial. Approximately nine months after her release, the mother was again arrested for petit theft. The mother was in and out of jail for various offenses until, in August 2008, the mother was charged with possession of a controlled substance. While out on court compliance, the mother was charged in early 2009 with possession of a controlled substance and possession of a forged instrument (a counterfeit $100 bill). The second possession charge was dismissed as part of a plea agreement. The mother was sentenced to a unified term of four years, with a minimum period of confinement of two years, for the 2008 possession of a controlled substance, and a unified term of five years, with a minimum period of confinement of two years, for possession of a forged instrument. The court retained jurisdiction and the mother went on her first six-month rider.[1] After completing the rider, the mother was placed on probation. The Does then helped the mother obtain an apartment and the mother was employed until she relapsed by using methamphetamine near the end of 2009.

---

[1]     A "rider" refers to a period of incarceration that is part of the retained jurisdiction program.

Because of her struggles with drugs and alcohol and her frequent legal issues, the mother had sporadic contact with the child from 2005 to 2010. The mother would rarely visit the child at the Does' home, and would occasionally call when she was able. When the mother could not afford to come to the Does' home, Jane would facilitate a meeting when she and the child were in a nearby town, which occurred approximately once every two weeks. These visits would generally occur at a parking lot or store, and the mother would usually terminate the visits within twenty minutes.

After relapsing, the mother was sent to a treatment facility in early 2010. During the time that the mother was there, the Does took the child to see the mother on three separate occasions for periods of up to several hours, as allowed by the program. The mother would also occasionally call the child using her counselor's cell phone. When allowed by the program, the mother requested to have the child come stay with her at the treatment facility, but Jane denied this request because she did not feel it was in the child's best interest to stay with the mother--whom she had not lived with since she was a newborn--at a treatment facility while the mother was dealing with a drug and alcohol addiction.

The mother was terminated from the treatment program in the fall of 2010, after which she was immediately incarcerated and sent on her second rider in November 2010. Contact with the child during this time consisted of limited phone calls and an occasional letter. The mother was released from incarceration in May 2011. Over the next six months, the mother was sober, began working, and obtained her own apartment. However, the mother's contacts with the child remained sporadic and limited. She came to the Does' home to see the child once. The mother testified that this was due to financial limitations. As was the pattern for the majority of physical contact throughout the child's life, the mother would occasionally visit briefly with the child inside a store or in a parking lot, which was facilitated by the Does.

The last time that the mother saw the child was in October 2011. After that, the mother failed to check in for probation, resumed using methamphetamine, and absconded. A warrant for her arrest was issued. During this time, the mother had almost no contact with the child, aside from a few phone calls and letters. The mother incurred additional charges of felony eluding and possession of a controlled substance (methamphetamine) when she was apprehended. The mother was sentenced to a unified term of five years, with a minimum period of confinement of one year, for evading arrest and a unified term of seven years, with no minimum period of

3

confinement, for possession of a controlled substance. The mother has been incarcerated for these most recent offenses since June 2012. Jane testified that, up until the Does filed for termination of the mother's parental rights, the mother's contact with the child remained sporadic. After receiving notice of the petition, the mother began writing the Does concerning the child once a month and sent the Does a check to buy the child some books.[2]

Following the hearing, the magistrate requested further briefing from both parties as to whether the mother had willfully failed to maintain a normal parental relationship with the child and whether there was any just cause for her failures in light of the guardianship, which terminated any obligation for support and removed her legal ability to demand contact with the child. Both parties filed responsive briefing. The magistrate issued a memorandum opinion. In it, the magistrate noted that it was relying largely on facts as conveyed by the Does and the record, as multiple discrepancies in the mother's testimony combined with her admitted long history of drug use caused her testimony to be less credible. The magistrate terminated the mother's parental rights as to her child based on its findings that the Does had presented clear and convincing evidence that the mother had willfully abandoned the child without just cause for more than six months and that termination was in the best interest of the child. The mother appeals.

## II.

## STANDARD OF REVIEW

A parent has a fundamental liberty interest in maintaining a relationship with his or her child. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Doe v. State*, 137 Idaho 758, 760, 53 P.3d 341, 343 (2002). This interest is protected by the Fourteenth Amendment to the United States Constitution. *State v. Doe*, 144 Idaho 839, 842, 172 P.3d 1114, 1117 (2007). Implicit in the Termination of Parent and Child Relationship Act is the philosophy that, wherever possible, family life should be strengthened and preserved. I.C. § 16-2001(2). Therefore, due process requires that the grounds for terminating a parent-child relationship be proved by clear and

---

[2] Jane testified that this check was hard to cash. As a result, Jane asked the mother not to send her any more money in that form, but testified that she did not refuse to accept money from the mother in another form. The mother testified that the Does refused other attempts she has made to give money to support the child, but the only details she provided was that the Does told her at some point that the child did not need any more clothing and to only buy the child one gift for Christmas. The magistrate did not find the mother's testimony on this issue credible.

convincing evidence. *State v. Doe*, 143 Idaho 383, 386, 146 P.3d 649, 652 (2006). Indeed, because a fundamental liberty interest is at stake, the United States Supreme Court has determined that a court may terminate a parent-child relationship only if that decision is supported by clear and convincing evidence. *Santosky v. Kramer*, 455 U.S. 745, 769 (1982). *See also* I.C. § 16-2009; *In re Doe*, 146 Idaho 759, 761-62, 203 P.3d 689, 691-92 (2009); *Doe*, 143 Idaho at 386, 146 P.3d at 652.

Idaho Code Section 16-2005 allows a party to petition for termination of the parent-child relationship when it is in the child's best interest and any one of the following factors exist: (a) abandonment; (b) neglect or abuse; (c) lack of a biological relationship between the child and a presumptive parent; (d) the parent is unable to discharge parental responsibilities for a prolonged period that will be injurious to the health, morals, or well-being of the child; or (e) the parent is incarcerated and will remain incarcerated for a substantial period of time. Each statutory ground is an independent basis for termination. *Doe*, 144 Idaho at 842, 172 P.3d at 1117.

## III.

## ANALYSIS

The mother asserts that the Does failed to prove every element of abandonment by clear and convincing evidence and that the magistrate erred in finding that any such abandonment was willful and without just cause. The mother also asserts that the magistrate's finding that termination was in the best interest of the child was not supported by substantial and competent evidence. The Does argue that the mother's appeal in this case is frivolous and request attorney fees and costs on appeal.

### A.    Abandonment

Under I.C. § 16-2005, a court may terminate a parent-child relationship where it finds that the parent has abandoned the child and that termination of parental rights is in the best interest of the child. I.C. § 16-2005(1); *In re Doe*, 155 Idaho 505, 507, 314 P.3d 187, 189 (2013). A parent has abandoned his or her child when that parent "has willfully failed to maintain a normal parental relationship including, but not limited to, reasonable support or regular personal contact." I.C. § 16-2002(5). When termination is sought by grandparents seeking to adopt the child, "the willful failure of the parent to maintain a normal parental relationship as provided herein without just cause for six (6) months shall constitute prima facie

5

evidence of abandonment." *Id.* There is no universal standard for what constitutes a normal parental relationship and whether such a relationship exists depends on the facts and circumstances of each case. *Doe v. Doe*, 150 Idaho 46, 50, 244 P.3d 190, 194 (2010).

### 1.  Sufficiency of the evidence

The mother contends that the magistrate's finding that the Does had shown by clear and convincing evidence that the mother abandoned the child was not supported by substantial and competent evidence. On appeal from a decision terminating parental rights, this Court examines whether the decision is supported by substantial and competent evidence, which means such evidence as a reasonable mind might accept as adequate to support a conclusion. *Doe v. Doe*, 148 Idaho 243, 245-46, 220 P.3d 1062, 1064-65 (2009). We indulge all reasonable inferences in support of the trial court's judgment when reviewing an order that parental rights be terminated. *Id.* The substantial evidence test requires a greater quantum of evidence in cases where the trial court's finding must be supported by clear and convincing evidence than in cases where a mere preponderance is required. *In re Doe*, 143 Idaho 343, 346, 144 P.3d 597, 600 (2006). Clear and convincing evidence is generally understood to be evidence indicating that the thing to be proved is highly probable or reasonably certain. *In re Doe*, 143 Idaho 188, 191, 141 P.3d 1057, 1060 (2006). Further, the magistrate's decision must be supported by objectively supportable grounds. *Doe*, 143 Idaho at 346, 144 P.3d at 600.

Here, the magistrate determined that the Does had shown by clear and convincing evidence that the mother had failed to maintain a normal parental relationship with the child for over six months. This was based on Jane's testimony that the mother had no visits and few other contacts with the child while the mother absconded from October 2011 to June 2012. Although the mother testified that she had called the child up to once a week, the magistrate determined that Jane's testimony on this issue was more credible. Substantial and competent evidence supports this decision, as the mother's testimony was plagued by inconsistencies and her long history of drug and alcohol abuse made her ability to accurately recall facts questionable. The magistrate concluded that the mother's active avoidance of personal contact with the child while absconding "simply cannot be considered a normal parental relationship."

In addition, the magistrate also concluded that the mother had failed to ever establish a normal parental relationship with the child. The record indicates that the mother has provided almost no support, much less "reasonable support," of the child since the day the child was born.

6

Indeed, beginning just a month after the child was born, the Does have provided for all of the child's financial, educational, and emotional needs. The mother has also failed to maintain regular personal contact with the child. Indeed, even when the mother was sober and was not incarcerated, in treatment or absconding, she only saw the child once every two weeks in addition to occasional calls and letters as the child got older. This contact was further limited by the mother's decision to terminate most visits after just twenty minutes--a point she did not dispute. As noted by the magistrate, even if the mother's contention that she saw the child an average of once a week is accepted, by her own estimation the average time the mother spent with her child in an average year was seventeen hours. This does not constitute regular personal contact that is indicative of a normal parental relationship under the circumstances, even when combined with the occasional phone calls and letters. Thus, substantial and competent evidence supported the magistrate's conclusion that the Does had shown by clear and convincing evidence that the mother abandoned the child.

### 2. Willful conduct

The mother also argues that her failure to maintain a normal parental relationship with the child was not willful, as the guardianship prevented her from having any legal rights to demand visitation. For one to willfully fail to do something, he or she must have the ability to do it. *Doe I v. Doe II*, 148 Idaho 713, 716, 228 P.3d 980, 983 (2010). Indeed, the key issue regarding willfulness is whether the parent is capable of maintaining a normal relationship with the child. *Doe*, 155 Idaho at 508, 314 P.3d at 190. Forced absence, in and of itself, is insufficient to constitute abandonment and is merely one factor to be considered. *Doe I*, 148 Idaho at 716, 228 P.3d at 983. When a parent is legally prohibited from seeing his or her children, the parent does not have the ability to maintain a normal relationship with them, and the failure is therefore not willful. *Doe*, 155 Idaho at 508, 314 P.3d at 190. However, this is true only so long as the parent does what he or she can under the circumstances preventing the parent from maintaining a normal parental relationship. *See Doe v. State*, 137 Idaho 758, 761-62, 53 P.3d 341, 344-45 (2002) (holding that the limitation on contact that results from incarceration was not alone sufficient to indicate willful abandonment where the parent did everything he could to establish a relationship under the circumstances).

The magistrate concluded that the existence of a guardianship, in and of itself, will not prevent a finding that abandonment was willful. We agree. A guardianship is not the type of

forced absence that prevents a finding of willful abandonment. *See Doe I*, 148 Idaho at 716, 228 P.3d at 983; *Doe*, 137 Idaho at 761-62, 53 P.3d at 344-45. This is because a guardianship, unlike incarceration or a court order, does not legally prohibit the parent from having contact with his or her child. Instead, it simply requires the parent to utilize the courts to establish legally enforceable visitation rights if the guardians are unwilling to allow contact. *See Doe*, 155 Idaho at 509, 314 P.3d at 191 (rejecting a mother's argument that she was prohibited by a guardianship from contacting her child when a court-granted visitation schedule expired and that she was not required to subsequently secure visitation through the courts).

There was little need for the mother to utilize the courts in this case, as the Does openly allowed--and usually facilitated--contact between the mother and the child. The guardianship did not legally prevent or prohibit the mother from taking advantage of the opportunities given to her. Although there was testimony indicating that the Does had at times refused to facilitate contact with the child or set boundaries on the means or manner of contact, there is a significant difference between refusing to facilitate contact and obstruction of contact. The Does had no responsibility under the guardianship or otherwise to actively assist the mother in having contact with the child. Thus, the Does' unwillingness to accept collect calls or provide the mother with money to make calls while incarcerated, take the child to see the mother while incarcerated, allow the mother to visit the child while accompanied by drug addict friends, or allow the mother to live in a trailer on their property--none of which was required under the guardianship--did not constitute obstruction of the mother's ability to form a relationship with the child.[3] As a result, the guardianship did not prevent the mother from having contact with her child and does not prevent a finding that her abandonment of the child was willful.

As concluded by the magistrate, the only cause of the mother's failure to form a normal parental relationship with the child was the mother's own decisions. The last time that the mother saw the child was in October 2011. After that, the mother chose to abscond after she

---

[3]     Jane testified that any limitations they placed on the mother's contact with the child were done out of concern for the child's best interest. For instance, the Does refused to take the child to visit the mother while she was incarcerated because they did not want to expose the child to that type of situation and environment. In addition, the Does denied the mother's request to live in a trailer on their property because, according to Jane, a prosecutor told them that having the mother--a known methamphetamine user--living on their property would put the Does' custody of the child in jeopardy.

failed to check in for probation and resumed using methamphetamine. During this time, the mother chose to have no visits and almost no other contact with the child, aside from a few phone calls and letters, for over six months. The lone cause of this lack of contact was the mother's decision to actively and willfully avoid contact with the child for the purpose of avoiding apprehension. As stated by the magistrate:

> [The mother] was not merely not having visits with [the child,] she was *actively* avoiding the same for fear of being apprehended. This Court would be hard pressed to find and conclude that a parent who is *actively and wilfully* avoiding personal visits with their child could be considered [as having] a normal parental relationship. This Court will find and conclude, by clear and convincing evidence, that there [were] no personal visits between [the mother] and [the child] for a period of at least six months and that [the mother]'s *active and wilful* avoidance of such personal visits simply cannot be considered to be a normal parental relationship . . . .

Moreover, even before the specific period of abandonment, the mother's failure to establish a normal parental relationship, or as close to one as the circumstances would reasonably allow, resulted primarily from her own choices. Although her forced absence from over half of the child's life due to incarceration and stints in treatment were not willful, the mother's failure to regularly contact the child during those forced absences and her lack of effort to have more contact with the child while the mother was free were willful. Indeed, Jane testified that the pattern of contact, or lack thereof, between the mother and the child was essentially consistent from 2005 to 2010. During that time, the mother would rarely come to visit the child at the Does' home and would call or write occasionally. Most contact was facilitated by the Does, but even that was brief and impersonal, as the visits would usually occur in a store or parking lot and be terminated by the mother within twenty minutes. As noted by the magistrate, this pattern of contacts was dictated by the mother's convenience and belied the mother's testimony that she was trying to become more involved in the child's life. Despite having a blanket invitation from the Does to see the child (albeit with reasonable restrictions), the mother repeatedly and willfully chose not to take advantage of the available opportunities, many of which were facilitated by the Does, to have contact with the child on a basis more consistent with a normal parent-child relationship. Accordingly, the magistrate's conclusion that the Does established clear and convincing evidence of the mother's willful abandonment of the child was supported by substantial and competent evidence.

### 3.     Just cause

The mother further asserts that any abandonment on her part, even if willful, was not without just cause.  In a termination proceeding, the petitioner bears the burden of persuasion to show that the respondent parent is without just cause for his or her failure to maintain a normal relationship with the child.  *Doe*, 155 Idaho at 510, 314 P.3d at 192; *Doe I v. Doe*, 138 Idaho 893, 903, 71 P.3d 1040, 1050 (2003).  If the petitioner makes the prima facie case of abandonment, including a showing that it is without just cause, then the respondent parent holds the burden of production to present evidence of just cause.  *Doe*, 150 Idaho at 50, 244 P.3d at 194; *Doe I*, 138 Idaho at 903, 71 P.3d at 1050.  If the trier of fact finds that there is no just cause then the petitioner has met the burden of persuasion.  *Doe*, 143 Idaho at 192, 141 P.3d at 1061; *Doe I*, 138 Idaho at 903-04, 71 P.3d at 1050-51.

The mother argues that her financial and logistical difficulties constitute just cause for her abandonment of the child.  The mother testified that, when not incarcerated, in treatment or absconding, she was not able to visit the child at the Does' home more because she did not have enough money or the logistical means to do so.  The mother further argues that, when incarcerated, her lack of funds prevented her from calling or writing the child regularly.  She also argues that the Does' refusal to provide her with money to contact the child more regularly somehow exacerbated her financial difficulties.  This argument ignores that the relevant period for which the Does were required to show there was no just cause was the more than six months that the mother was absconding.  As noted by the magistrate, the mother's desire to avoid apprehension while on the run for more than six months cannot, as a matter of law, constitute just cause for her willful failure to maintain a normal parental relationship with the child.  Thus, the Does established their prima facie case of willful abandonment without just cause, shifting the burden of production to the mother.

The mother failed to meet this burden, as the magistrate found that the evidence showed that there were no financial, physical, or logistical barriers preventing the mother from contacting the child during the more than six-month period or otherwise.  This was because the mother lived close to the Does and was often employed when not incarcerated, in treatment, or evading arrest.  Jane usually facilitated visits by bringing the child to see the mother when the mother could not afford to come to the child.  These visits usually occurred at the mother's request, and there was no evidence indicating that Jane had ever or would have ever denied the

10

mother's request to have Jane facilitate a visit while the mother was sober and free. Nevertheless, as previously noted, the mother would generally terminate these facilitated visits within twenty minutes, despite Jane's established willingness to facilitate longer visits like the ones that occurred at the treatment facility. Thus, there was no financial or logistical justification for the mother's failure to establish a normal parental relationship with the child, and the magistrate did not err in concluding that the Does had provided clear and convincing evidence that the mother's failure was without just cause.

## B.   Best Interest of the Child

The mother contends that the magistrate erred in concluding that termination was in the best interest of the child. Once a statutory ground for termination has been established, the trial court must next determine whether it is in the best interest of the child to terminate the parent-child relationship. *In re Aragon*, 120 Idaho 606, 611, 818 P.2d 310, 315 (1991). When determining whether termination is in the child's best interest, the trial court may consider the stability and permanency of the home, the unemployment of the parent, the financial contribution of the parent to the child's care after the child is out of the parent's custody, the improvement of the child while out of the parent's custody, the parent's efforts to improve his or her situation, and the parent's continuing problems with the law. *In re Doe*, 156 Idaho 103, 111, 320 P.3d 1262, 1270 (2014); *see also Doe v. Roe*, 133 Idaho 805, 809-10, 992 P.2d 1205, 1209-10 (1999); *Doe v. State, Dep't of Health & Welfare*, 122 Idaho 644, 648, 837 P.2d 319, 323 (Ct. App. 1992). A finding that it is in the best interest of the child to terminate parental rights must still be made upon objective grounds, supported by substantial and competent evidence. *In re Doe*, 152 Idaho 953, 957, 277 P.3d 400, 404 (Ct. App. 2012).

Here, the magistrate noted that the child's current living situation with the Does was "almost an idyllic life," recounting undisputed testimony that established the Does had entirely provided for all of the child's needs, including a stable and loving home surrounded by loving extended family. Additionally, the child had established a very close and loving relationship with both John and Jane. The only thing the child lacked was the sense of security and stability that would come from knowing that her situation with the Does was permanent. Indeed, the child requested that the Does adopt her so that they could be a "real family." The magistrate recognized the legal reality of the situation, noting that--whether or not it granted the Does' petition for termination--the Does would likely maintain custody of the child until she became an

11

adult and the mother's contact with the child would continue to be dictated by the Does.[4] This was because the mother was still incarcerated, had significant legal problems, and had not provided for the child's upbringing in any fashion, making it highly unlikely that she would be able to overturn the guardianship in the near future. Nonetheless, the magistrate determined that it was most important to grant the child the security she desired by making her supportive and nurturing situation with the Does permanent and making it possible for her to be sealed to them consistent with her religious convictions.

The mother contends that the magistrate's decision as to the best interest of the child was improperly based on the child's religious convictions. However, the magistrate acknowledged its duty to remain neutral as to religion in custody matters and did not make its decision on that basis. *See Compton v. Gilmore*, 98 Idaho 190, 192, 560 P.2d 861, 863 (1977); *see also Osteraas v. Osteraas*, 124 Idaho 350, 354, 859 P.2d 948, 952 (1993). Instead, it noted that the critical consideration was that termination of the mother's parental rights would provide the child with stability and security in addition to satisfying the child's desire to be permanently united with the Does, regardless of the source of that desire.

The mother also argues that termination would not be in the child's best interest based on the mother's unproven allegations that John physically abused the mother when she was young and the Does' decision to homeschool the child.[5] The mother fails to expand on the relevance of these arguments, aside from arguing that the discipline used by the Does is not in the child's best interest. This is based on the undisputed testimony that John occasionally pulled the child's hair. However, John testified that use of hair pulling is rare and that it is not done to punish or hurt the child, but to get her attention and gain control when she is misbehaving. Indeed, the Does testified that most of the discipline used is positive correction. In any event, this allegation speaks more to whether adoption by the Does is in the child's best interest, not whether termination of the mother's parental rights is in the child's best interest. On that point, the substantial and competent evidence discussed above shows that the mother has never provided

---

[4]      The Does testified that they would never entirely cut the mother out of the child's life, regardless of the outcome of the termination proceedings.

[5]      The mother alleged that John had struck her and broke her nose when she was sixteen. John was arrested, but the charges were ultimately dismissed. The Does testified that the allegations were untrue and the mother presented no other evidence to substantiate her claims.

for the child, has never established a normal parental relationship with the child, and shows no signs of being able to do either of these things in the future based on her record of drug addiction, unstable employment, and trouble with the law. This evidence clearly and convincingly supports the magistrate's finding that termination of the mother's parental rights was in the best interest of the child. Thus, the magistrate did not err.

## C. Attorney Fees and Costs

The Does request attorney fees and costs on appeal under I.C. §§ 12-120 and 12-121 and I.R.C.P. 54(d)(1). However, I.C. § 12-120 does not apply to cases involving termination of parental rights. Instead, the Does' request for attorney fees is governed by I.C. § 12-121. An award of attorney fees on appeal is proper under I.C. § 12-121 only if this Court is left with the abiding belief that the appeal was brought or pursued frivolously, unreasonably, and without foundation. *Doe*, 133 Idaho at 810, 992 P.2d at 1210. Generally, when an appeal simply disputes the trial court's factual findings, which are supported by substantial although conflicting evidence, the appeal is considered frivolous and an award of attorney fees is proper under I.C. § 12-121. *Doe*, 133 Idaho at 810, 992 P.2d at 1210; *Zanotti v. Cook*, 129 Idaho 151, 155, 922 P.2d 1077, 1081 (Ct. App. 1996). However, considering the gravity of the liberty interest affected in parental termination cases, the appeal in this case challenging factual findings based on conflicting evidence was not frivolous. *See Doe*, 133 Idaho at 810, 992 P.2d at 1210. Accordingly, the Does' request for attorney fees on appeal is denied. Pursuant to I.A.R. 40, costs are awarded to the Does as a matter of course.

### IV.

### CONCLUSION

The magistrate did not err in finding that the mother willfully failed, without just cause, to maintain a normal parental relationship with the child for a period of at least six months. Moreover, there is substantial and competent evidence to support the magistrate's finding that the Does had shown by clear and convincing evidence that the mother abandoned the child and that termination was in the child's best interest. Accordingly, we affirm the magistrate's decree terminating the mother's parental rights as to the child on the ground of abandonment. Costs on appeal, but not attorney fees, are awarded to the Does.

Chief Judge GUTIERREZ and Judge GRATTON, **CONCUR.**

13